## The Mayor, Aldermen and Inhabitants of New Orleans, appellants v. The United States.

The United States alleged, by a petition presented to the district court of the United States for the district of Louisiana, that by the treaty of cession of the late province of Louisiana, the United States succeeded to all the antecedent rights of France and Spain, as they then were, in and over the province, the dominion and possession thereof, including all lands which were not private property; and that certain lots and vacant lands in front of the city of New Orleans, which the petition asserted passed to the United States by the cession, had, by an ordinance of the city, been directed to be sold for the use of the city. The petition prayed that the city of New Orleans should be perpetually enjoined from selling the same, or doing any other act which shall invade the rightful dominion of the United States over the said land, or their possession of it. The city of New Orleans claimed the ground; which lies between the line of the front houses of the city and the river Mississippi: First, as having been left by the king of France as quays for the use and benefit of the city. Second, because if since the foundation of the city the space of ground became wider than was necessary for the use of the city as quays, it was occasioned by alluvial deposits in front of the city, in consequence of works erected by the inhabitants at the expense of the city to advance the levee in front on the river. Third, because by the laws of Spain, in force when the alluvions were formed in front of the city, such formations belonged to the inhabitants of the cities; who may dispose of the same as they may think convenient, on their leaving what is necessary for the public use. The district court of Louisiana ordered the perpetual injunction as prayed; and that decree was reversed on appeal.

In order to dedicate property for public use, in cities and towns and other places, it is not essential that the right to use the same shall be vested in a corporate body. It may exist in the public, and have no other limitation than the wants of the community at large.

The principles upon which the case of the city of Cincinnati v. White, 6 Peters 431, and the case of Barclay and others v. Howell, 6 Peters 498, were decided, examined and affirmed.

If buildings had been erected on lands within the space dedicated for public use, or grants of part of the same have been made by the power which had authority to make, and had made a dedication of the same to public use; the erection of the buildings and the making of the grants would not be considered as disproving the dedication, and the grants would not affect the vested rights of the public.

The question is well settled at common law, that the person whose land is bounded by a stream of water which changes its course gradually by alluvial formations, shall still hold the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded, is subject to loss by the same means which may add to his territory : and as he is also without remedy for his loss in this way, he cannot be held accountable for his gain. This rule is no less just when applied to public, than to private rights.

It would be a dangerous doctrine to consider the issuing of a grant, as conclusive evidence of a right in the power which issued it. On its face it is conclusive, and

cannot be controverted; but if the thing granted was not in the grantor, no right passes to the grantee.

APPEAL from the district court of the United States for east Louisiana.

On the 3d day of March 1825, the attorney of the United States for the eastern district of Louisiana, filed a petition in the district court, stating that the mayor of the city of New Orleans, in pursuance of an ordinance of the city council thereof to that effect, had advertised for sale in lots, the vacant land included between Ursuline, Levee and Garrison streets, and the public road in the city of New Orleans; and also the vacant land included between the customhouse, Levee and Bienville streets, and the public road in the same city.

That by the treaty of cession of the late province of Louisiana to the United States, they succeeded to all the antecedent rights of France and Spain, as they then were in and over the province, the dominion and possession thereof, including all lands which were not private property; and that the dominion and possession of the vacant lands endeavoured to be sold by the city council had, ever since the discovery and occupation of the province by France, remained vested in the sovereign, and had not, at any time prior to the date of the treaty, been granted to the city of New Orleans.

"Wherefore, inasmuch as the said attempt of the said city council to sell the lands as private property, is an invasion of the rightful dominion and possession of the United States in the premises," the petition prays that the mayor, aldermen and inhabitants of New Orleans may be summoned to appear and answer the petition; and in the meanwhile that they may be inhibited by injunction from proceeding further in the said attempt or from doing any act to invade the rightful dominion and possession of the United States in the said land; and that after due proceeding the injunction be made perpetual; and also for all other suitable and needful relief.

The district judge ordered an injunction, according to the prayer of the petition. In December 1827, the corporation of New Orleans filed an answer to the petition of the United States, which, after the usual reservations, denied all the material facts and allegations in the petition; and positively denied that the dominion and possession of the pretended vacant land, which the respondents had offered to sell, by an ordinance of the city council, "was, or did (at the time

of the treaty of cession to the United States) remain vested in either the king of Spain or the sovereign of France, either as vacant land, or under any other denomination, and that the same passed as such to the United States."

The answer prayed that the petition should be dismissed, and the injunction dissolved.

In December 1829, the corporation of New Orleans filed a supplemental answer to the petition of the district attorney of the United States; in which they ask leave to add the following pleas to those contained in their original answer. They say that the inhabitants of the city of New Orleans are the true and lawful proprietors of the property.

1. Because all the space of ground which exists between the front line of the houses of the city and the river Mississippi, was left by the king of France, under the name of *quays*, for the use and benefit of the said inhabitants; as appears by authentic copies of the original plans of the foundation of the city.

2. Because if since the foundation of the city of New Orleans the space became wider than was necessary for public use, and for the *quays* of the city ; it was in consequence of an increase formed by alluvion in the greatest part of the front of the city, and the works which were successively made, from time immemorial, by the inhabitants of the city at their expense, to the levee in front thereof, to advance it nearer to the river than it was formerly.

3. Because, by the laws of Spain which were in force at the time the alluvions were formed, and said works were made, alluvions formed by rivers in front of cities belonged to the inhabitants thereof; who may dispose of the same as they think convenient, on their leaving what is necessary for the public use.

Further they say, the vacant lots claimed in the petition are worth the sum of at least sixty thousand dollars, of the property and disposal of which the respondents cannot be deprived, unless they were previously indemnified therefor by the government of the United States.

The United States, in December 1830, filed a replication to these pleas, denying all the allegations contained in the answer, and the supplemental answer to the petition.

The case was afterwards submitted to a jury; but on the jury not being able to agree, they were discharged by the court, with the consent of the parties. Afterwards, the trial by jury being waived by consent, the case was submitted to the court upon statements of

facts prepared by the parties; and on the 18th day of June 1831, the district court made a decree in favour of the United States, being of "opinion that the defendants had not exhibited sufficient evidence to support their title to the premises in dispute;" and decreed, that the injunction of the United States be made perpetual.

The corporation of New Orleans prosecuted an appeal to this court.

The statement of facts exhibited, as proved by the United States, contained:

1. A reference to proceedings before the commissioners of the United States, under the acts of congress relating to the adjusting of land claims in Louisiana, relative to certain claims of lands within the property asserted to belong to the corporation of New Orleans; which claims had afterwards been confirmed by congress.

2. A grant for a part of the land to Francisco Loiteau. The particulars of the claims, referred to in No. 1, and of the grant to Loiteau, are stated in the opinion of the court.

3. Evidence that on the ground the United States, in 1819, erected a building for a customhouse, in which the courts of the United States are held: that previous to 1793, the Spanish government had erected on part of the ground two buildings; one used as a customhouse, at the time of the cession; the other as a tobacco warehouse: that a portion of a brick house still existed on the lot granted to Francisco Loiteau: that the corporation had erected water-works on part of the ground, which are rented to individuals.: barracks for the accommodation of the garrison of New Orleans were placed on the ground by the French government in 1757, which existed and were occupied at the time of the cession.

4. An act of congress of 1812, granting to the city of New Orleans a lot of ground in the city: an act of 3d March 1822, entitled "an act supplemental to an act entitled an act authorizing the disposal of certain lots of ground in the city of New Orleans and town of Mobile," which was alleged to have been passed at the instance of the corporation of New Orleans.

5. A copy of proceedings before the commissioners of the United States on certain claims of the corporation of New Orleans relative to part of the ground.

6. An ordinance of Don Alexander O'Reilly, dated the 22d February 1770. This decree designates the city properties "of the city

of New Orleans," but does not include in the same the property in controversy.

7. The mayor, aldermen and inhabitants derive a large revenue from duties imposed on vessels and boats moored at the Levee, in front of the city of New Orleans. It amounted, during the year 1830, to 30,000 dollars. And a duty has always been collected by the municipal authorities of New Orleans, on vessels moored at the Levee, since the promulgation of the ordinance of O'Reilly, above referred to.

On the part of the corporation of New Orleans, the following statement of facts, and also the documents annexed to the same, were filed in the cause:

1. From time immemorial, both before and subsequently to the cession of Louisiana to Spain, there has existed, for the convenience of commerce, both in the towns of France and in those of the French colonies, situated on navigable streams or on the sea-shore, a vacant space between the first row of buildings and the water's edge; which vacant space is generally termed a *quay*, and is destined for the reception of goods and merchandize imported or to be exported. These quays are of various dimensions, regulated in seaports by commercial operations and convenience, and in those situated on rivers, both by the above considerations and by that of the encroachments which the rivers may make on their banks.

2. Nevertheless, the government, or municipal authorities of those places, frequently permit buildings, intended for purposes of public or private convenience, such as market-houses, fountains, baths, coffee-houses, &c., &c., to be erected on part of those *quays*.

3. Towns in the French colonies have never been incorporated, like those of the United States; they are founded in virtue of orders emanating from the government, or from the minister of the marine, and transmitted to the governors of the colonies; and their administration was confided to intendants, who had authority to enact the necessary police regulations.

4. The governors of colonies, on receiving these instructions, issued their orders to the chief engineer of the colony, or, in default of such officers, to a surveyor, to draft a plan of the projected town. This engineer, or surveyor, drafted the plan and signed it, with mention of the place and day, month and year, when it was completed. This plan, thus signed and dated, was delivered over to the governor,

and lots and squares were granted or sold out to individuals, with reference to it.

5. The chief engineer was an officer of the royal corps of engineers, and performed the duties both of military and civil engineer.

6. For a number of years before the revolution, there has existed in France, an office attached to the navy department, in which all manuscript plans and maps of the French colonies, or their cities, forts, fortifications, &c. were deposited.

7. All the land on the banks of the Mississippi, in Lower Louisiana, is alluvial. This river is subject to annual and periodical rises, and unless its waters were confined within the channel by strong embankments, they would overflow all the adjoining land until they fell and retired within the bed of the river; that is to say, during about five or six months in each year. But for these dykes, or *levees* as they are here called, the construction and maintenance of which cost the inhabitants, who are, and have always been, liable to the performance of this duty, a great deal of money and labour, the whole country bordering on this part of the Mississippi, would be uninhabitable during the spring and summer.

8. During this rise, the Mississippi is continually effecting changes in its banks; it undermines them in the bends, and carrying off the earth which it detaches, deposits it on the points; so that in many parts of these bends, as soon as the waters fall and return to their accustomed bed, the land on the margin being deprived of support, gives way, falls into the stream, disappears, and is carried down by the current until it is united to the bank at some lower part of the river.

9. For these reasons, it is an almost universal usage among persons dwelling on the banks of the river, to build their houses at a sufficient distance from its margin, to allow space for the construction of new levees, and to furnish new public roads, without being compelled to remove their houses and other buildings whenever the levees and roads are carried off by the stream.

10. Under the French and Spanish governments, the vacant space between the first row of buildings and the margin of the Mississippi, always existed; it never was divided into squares and lots. The streets of the city have never been laid off, or continued from said row of houses to the river. It was only in 1818, that the corporation caused the said streets to be prolonged as far as the Levee.

11. Under the Spanish government there was, on this vacant space, near the river, a wooden market-house, constructed by the

cabildo, (council) between St Anne and Dumaine streets. This building was demolished by the corporation, and the present market-house constructed on the same spot.

There was, also, on this square, and adjoining to the Levee, between Dumaine and St Philip streets, a wooden building, belonging to Mr Arnaud Magnon, who had erected it in virtue of an authorization from the Spanish governor. This same Magnon had, with the permission of the *cabildo*, built, near the same spot, and lower down than his house, between the river and the Levee, and on an alluvion then recently formed, a large shed, or scaffold, which he used as a workshop, he being a ship-builder.

There were, also, on this part of the bank, at the foot of the Levee, in front of the public square, several small wooden cabbins, which the cabildo had permitted individuals to erect there, after the fire of 1798, who were subject to the payment of a small annual rent, for the benefit of indigent orphan children. These huts were destroyed after the cession of Louisiana to the United States, and at the instance of the corporation.

There were, also, on this vacant ground, under the Spanish government, 1st, a wooden building, between customhouse and Bienville streets, which was used as a customhouse ; 2d, a large storehouse, also of wood, near the said customhouse, in which the tobacco (of which the government had a monopoly) was stored. This storehouse did not exist at the time the United States took possession of the country. The customhouse, which was in a very bad condition, was abandoned at that time, and the United States customhouse was established, at the time of the cession, in a small building situated on a portion of the ground occupied by the old royal storehouses, between Dumaine and St Philip streets.

12. Before the cession of this country to the United States, this vacant space, throughout the whole extent of the front of the city, was used by the public. It was, at that time, covered with grass and weeds, and the horses and cattle of citizens were sent to pasture upon it. Since the cession, and since the increase of the commercial business of the city, the vegetation has disappeared, but the inhabitants of the city have, particularly since the cession, continued to use the greater portion of this space for the transportation, lading, and unlading of goods, and as a place of deposit for materials, &c. The streets, running at right angles to the river, were prolonged by the corporation as far as the Levee, and this prolongation was executed and kept up at their expense. In 1818, they made, and have

since kept in repair, at their own expense, a new street, or high road, on that large open space at the foot of the Levee, and throughout its whole extent.

13. Under the Spanish government the inhabitants possessed the commons all around the city; a part of which they appropriated to various uses. Governor Carondelet, at the request of the *cabildo*, caused a plan of it to be prepared by the surveyor-general, Laveau Trudeau, which was not finished until the year 1798 ; a copy of which plan is annexed to the proceedings in this cause.

14. The levee in front of the city has always been made and kept in repair by the inhabitants of New Orleans. In 1805, this levee was generally, throughout its whole extent, three and a half feet high, from fifteen to twenty feet broad at top, and widening towards the basis.

15. Before the year 1815, this levee was undermined in many places by the river, and threatened to fall in. In order to prevent this accident, which would have compelled the corporation to make a new one nearer the houses, and consequently on the vacant space, they caused, at their own expense, carpenter's work, to a large amount, to be done in front of the levee ; by means of which it was put in the strong and solid state in which it now is. The point at which this work was most required, and where most of it was performed, was between St Louis and Toulouse streets ; where the soil on which the levee rested was so much undermined by the current, that the water sprung up through it in large quantities, and the owners of the houses in that quarter feared that their foundations would give way. The works above mentioned arrested the progress of a danger which was so justly apprehended.

16. Since the taking possession of Louisiana by the United States, an alluvion has been, and is still continually forming in the river Mississippi, in front of the city of New Orleans ; particularly towards the upper end and lower extremities of the city. These alluvial formations are exhibited, together with the streets made in 1818, in the plans draughted by Joseph Pelie, city survevor ; and which are annexed to the record.

17. In consequence of works ordered by, and performed at the expense of the corporation, the levee in front of the city is now, in the upper part of the city, one hundred and forty feet wide ; in the centre of the city from sixty-six to eighty feet wide. These augmentations have been made without encroaching on the vacant space

between the street opened in 1818 and the water's edge, on the alluvial soil since formed on the outside of the levee.

18. Parts of this vacant space might be disposed of to individuals without at all interfering with the public use of it, or with the loading or unloading of goods, the levee, as it now is, being amply sufficient for all these purposes.

19. There are two copies of plans of the city annexed to the record; the one made in 1724 by Mr De Panger, and signed by him; the other made in 1728 by Mr Nicholas Broutin; on both of which the vacant space, the subject of the present controversy, is designated by the name of quay. The former of these plans is not authenticated; the latter is authenticated, according to all the forms required in France for the authentication of copies of acts or instruments in foreign countries. These two copies of plans are taken from copies deposited among the archives of the city since the end of the year 1819; and which Moreau Lislet, Esq. counsellor at law for the corporation, had caused to be obtained from the office of plans and maps of the French colonies attached to the department of the navy, and of French colonies. Nicholas Broutin was the engineer of the king of France in Louisiana.

20. Authentic copies of various instruments, by which lots situated in front of the city were granted or sold, under the French government, before the cession to Spain, and in which they are designated as situated on the quay, or fronting the quay.

21. A plan which is found in the work of Peré Charlevoix, the Jesuit, entitled "History of New France, with the historical journal of a voyage, undertaken by order of the king, in North America," published at Paris in the year 1724, in three volumes, in quarto, vol. 2, p. 423; in which also, the vacant space, the subject of the present controversy, is denominated a quay.

22. The laws of France, and of its colonies, prevailed in Louisiana from the first settlement of the colony until the 25th of November of the year 1769; when Alexander O'Reilly, captain-general, invested with full powers for that purpose by the king of Spain, abolished them, and substituted in their stead the laws of Spain; which were in force at the time this suit was instituted.

23. Three works, entitled "Histoire de St Dominique, par Moreau de St Mary," in two volumes, in quarto; "Histoire de la Nouvelle France, par le Pere Charlevoix," three volumes, in quarto; and "History of Louisiana, by Francois Xavier Martin," in two

volumes, in octavo, are admitted to be works of accuracy and authenticity, on the subjects of which they treat; and may be referred to as evidence in this cause.

The case was argued by Mr Webster, and by Mr Livingston, for the appellants; and by Mr Butler, attorney-general, for the United States.

A printed argument, prepared by the counsel for the appellants in New Orleans, was also laid before the court.

The appellants insisted:

1. Upon the original plans of the city; as made by the king of France at its foundation in the years 1724 and 1728; from which it appears that the space of ground in question, to its whole extent, was designated as quays or wharves.

2. The concurrence in this fact of every plan of the city now extant having any semblance of authority, as that of Charlevoix's History, and the absence of any document that gives a contrary, or that does not give this destination to it.

3. The uninterrupted possession and enjoyment of the land, as common, by the inhabitants of the city, from the years 1724 and 1728 up to the commencement of this suit.

4. That all the lots and squares of the city have been sold or granted in reference to the plans before mentioned. This fact, admitted in clear and unqualified terms, might be considered as decisive of the case.

5. The universal understanding of the highest officers of the French government in the colony, and the notaries and persons engaged in the purchase and transfer of property, as exhibited in the various acts and documents, found in the record, and the repeated acts of the Cabildo or city council, exercising ownership and jurisdiction over the land.

6. That the streets of the city were never continued through this space to the river until the year 1818, when it was done by the corporation. It continued entirely vacant for public use as commons of the city.

Mr Webster, for the appellants.

The United States claim in this case the exclusive right over the property described in the proceedings, by virtue of their sovereignty;

and as succeeding to the sovereign rights of the kings of Spain and of France, over the territory of Louisiana, before the treaty of cession. They claim this as ungranted or vacant land ; and as such that it passed to the United States by the treaty. While they do not deny that it may be subject to certain uses by the inhabitants of the city of New Orleans; they do deny that these uses have given any right of property in the soil, or authorized any interference with it, so as to change or affect it in any manner.

This is opposed by the appellants. They assert this property to be exclusively theirs ; and that it was the property of the corporation of New Orleans, before the United States acquired the territory of New Orleans. That it was theirs, by its having been a part of the city of New Orleans, from the first establishment of the same, by dedication ; when the place was first laid out by those who were proprietors of the whole soil : by possession ever since : and that if it had become enlarged by the addition of alluvion deposits, the additions, under the laws of France and of Spain, before the cession, and by the law of the United States, since the treaty, are the property of the corporation.

The position of New Orleans, and the peculiar character of the river Mississippi, make such additions from alluvion deposits frequent and extensive. The sinking of a frame of lumber, at the expense of the inhabitants of New Orleans, at a particular place in the river, opposite to the city, for the protection of the ground, has contributed to the rapid and extensive enlargement of the open space in front of the city. This enlargement has placed the levee, used for the purposes of trade, further in advance of the city ; and has left the ground, now in controversy, in such a situation as not to be required for the uses of commerce. The corporation of New Orleans, therefore, proposed to sell and dispose of it, to be occupied and improved by those who may desire to purchase it. So fully is it manifested that for commercial or any other public purposes large portions of the property are no longer required ; that it has, since the commencement of this suit, been sold by agreement between the United States and the corporation ; and the proceeds of the sale, nearly one million of dollars, may belong to the successful party in this appeal.

But the question to be settled in the case before the court, on the proceedings in the district court of Louisiana, is not whether the corporation of New Orleans has a right to use the property. It is the question, whether by the treaty of cession, the United States acquired

a right to the same, as having had transferred to them the sovereign rights of Spain, and afterwards of France over the territory. This is the right asserted by the petitioner, and put in issue by the answers and pleas.

The United States contend, that if the right of dominion did remain in the sovereigns of Spain and France, during the time the country was held by them, the property having been especially dedicated to public uses: by the cession the same became vested in the sovereignty of the United States, subject to those uses; and the use, not destroying or affecting the right of the United States to the land, passed, by the act of congress incorporating the city of New Orleans, to the corporation.

The statement of facts on the part of the corporation, makes a complete case for them. The land claimed by the United States appears to have been designated for the use of the city ever since it was founded. The plans referred to show that there was always an open space fronting on the river, and the uses of it were only such as were consistent with the public use. A customhouse; a parade ground for the military; barracks for the soldiers, were erected upon it. These were permitted; but they did not destroy the title of the citizens to it, nor did such uses convert it into public domain. The easements thus permitted might have been revoked. It is stated that a markethouse, erected of wood, was taken down by the corporation, and replaced by one of brick.

The city of New Orleans was bound to support the exterior levee, and this has always been done at the expense of the inhabitants. This expense has always been considerable. The United States have never been called upon to do this.

All the facts of the case show that the situation of the streets of New Orle..ns; the general conformity of the plan to the plans of other French cities; and the principles of the civil law, which apply in such cases, have full force in the present question.

In the 19th division of the statement of facts it appears that in 1724 and 1728 plans of the city were made, and on both of which the ground now claimed by the United States is designated as *quays*. One of these plans, that of 1728, has been recently obtained from France. It shows such a dedication to public uses as brings the case within all the principles established by this court in the Cincinnati case, and in the Pittsburgh case, reported in 6 Peters's Rep. The binding force of such plans is shown in 1 Starkie on Evidence 169.

The ownership of property may be public, and the use private. The decision of this court in the case of the Dartmouth College, established this. If it should be decided that the United States might have a customhouse on this ground, or a parade ground ; this will not sanction a claim to the property, or a right to sell it for the benefit of the United States. Have the United States a right to divert the property from the use for which it was dedicated, to enrich their treasury ?

It appears that the dedication of land to public uses is an estoppel of all subsequent claim to it, as well by the civil law as by the common law of England. French Pandects, art. 15, 28 ; 3 Martin's Rep. 296, 303, 304 ; 11 Martin's Rep. 660.

The sovereignty of Spain over this property existed before the cession, for the sole purpose of enforcing the uses to which it was appropriated. This right, and the obligations imposed upon it, became vested in the state of Louisiana, and did not continue in the United States after the state was formed. Acquiesced in by the United States, under the treaty, in the first instance ; it necessarily afterwards passed to the state. The United States cannot now enforce this use, and could not take the quay and dispose of it ; and unless this can be done, there is nothing to support this action. The preservation and the enforcement of the use must be by the state government. By the act of congress incorporating the city of New Orleans, all the use of the property became vested in the city.

The petition presented to the district court does not recognise any trust. It asserts a full and sovereign right to the whole land ; and if this court shall confirm the decree of the inferior court, the United States will hold it discharged from all trusts.

Mr Butler, attorney-general, for the United States.

The nature and object of the suit have been misapprehended by the opening counsel. It is not a suit in equity. The suit was commenced by petition and not by bill ; process of subpœna was not prayed ; nor were any of the proceedings in the cause on the equity side of the court.

The object of the suit was to prevent the city corporation from selling the premises in question ; and not, as the counsel supposed, to recover possession. The United States were themselves in possession ; and the action brought by them (which was in many respects analogous to an injunction bill) is well known to the civil law as a

prohibitory interdict; the nature and purpose of which are well explained in Livingston's answer to Mr Jefferson in the case of the New Orleans Batture. 5 Hall's Am. Law Jour. 270, 271, 272, 273.

The learned counsel for the city is also mistaken in supposing, that in order to maintain the decree appealed from, the United States must show that they have an absolute title to the lands in dispute, freed from any servitude or public use; such a title as to authorize the government to sell these lands, and to apply the proceeds at pleasure. The particular nature of their title was not stated in the petition. The averments were, no doubt broad enough to cover the absolute ownership of the premises; and in one of the aspects in which he should present the case, he would endeavour to show that the United States were the absolute owners; but it did not necessarily require such a title to maintain the petition. On the contrary, the averments contained in it would be sufficiently satisfied, and the plaintiffs would be entitled to the relief sought, if it were shown, either 1st. That the United States held the absolute ownership; or, 2d. That they held the title to the soil though charged with a servitude for the benefit of the inhabitants of the city, or of the public generally; or 3d. That the United States were entitled to a servitude in the lands, the title to the soil being in the city corporation; because in either of these three cases the attempt of the city to dispose of the lands in absolute ownership to individuals, without the consent of the United States, was an encroachment on their rights. The prohibitory interdict was an appropriate remedy for either of these three cases; and if it should appear that either had been made out, then the injunction by which the city was prohibited from selling these lands as private property, for its own exclusive benefit, was properly made perpetual.

The decree of the court below does not specify the particular ground on which it proceeded; and no explanatory opinion was delivered by the judge. If it can be shown that the United States have any such title in the soil, or to the use of the premises, as to make it inequitable for the city to proceed in its attempt to sell, then the decree must be affirmed. If this court should be of opinion that only a qualified title is shown by the United States, it could say so in its decree of affirmance; and thus protect the rights of all other parties. The real question in the case, therefore, is, have the United States such right in the soil or to the use of the premises, as to en-

title them to a decree prohibiting 'the absolute sale by the city corporation?

In support of the affirmative of this question, it is contended:

1. That the corporation of New Orleans has no title whatever to the soil, nor to the use of the vacant lands in dispute; but that under the treaty of cession of 1803, the United States became, and yet are absolutely entitled to the same.

Although it is sufficient for the plaintiffs, in order to retain their injunction and decree, to show that they have a qualified interest in the soil or in the use; yet it is obvious, that to entitle the city corporation to proceed with the proposed sales, it must show a complete title free from any public use. In this view of the case, the question of title becomes a material one; and it is desirable, on many accounts, that it should be decided in the present suit.

That the corporation has no title to the soil nor to the use of the premises in question, was expressly decided in 1833 by the supreme court of the state of Louisiana, in the case of D'Armas and Cucullu v. The Mayor, &c. of New Orleans; being the same case subsequetly brought by writ of error before this court, and dismissed for want of jurisdiction. 9 Peters 224. The plaintiffs, as grantees of the heirs of one Bertrand, claimed a lot included within the original limits of the *quay*, granted by letters patent to those heirs, pursuant to the act of congress confirming their claim, which was founded on the entry and possession of Bertrand in 1788, under a permission given by the Spanish governor. The corporation of New Orleans having asserted a claim to the lot as part of the quay, Cucullu and D'Armas instituted a suit in one of the district courts of the state of Louisiana, for the purpose of establishing their title under the United States, and the district court decreed in their favour, which decree was affirmed, on appeal, by the supreme court. The corporation contended: first, that the whole vacant space was their property; and secondly, that it had been irrevocably destined to public purposes when the town was established, and thereby for ever rendered inalienable even by the sovereign. On the last point the judges differed, chief justice Martin holding in the affirmative, but being overruled by the other judges. On the question of title in the corporation, the judges were unanimous. Judge Porter examined the point at large, and judge Matthews concurred with him; and though chief justice Martin dissented from the judgment; he

did not controvert the reasoning of judge Porter in this respect. It is shown by judge Porter, that according to the French law a city, or other community, can only acquire a title to land, or to the use of land, by letters patent from the king. He also shows, that according to the Spanish law, cities and other communities could not acquire title to the soil except by grant from the crown; though they might acquire title to the public use of land by grant, purchase or prescription.

The opinions of judges Porter and Matthews, in this case, notice all the prominent facts now relied on by the city, and answer almost every suggestion in the opening argument. Judge Porter shows that the case is distinguishable from that of the City of Cincinnati v. White, 6 Peters 431, by the circumstance that the lands were not set apart for public use by a private individual, but by the sovereign; and more especially because the questions were to be decided, not by the common law, but by the laws of France and Spain, which were in force prior to the cession.

It had been affirmed in the opening argument, that the United States had no greater or other power over the quays, than they had over the streets; and the counsel for the United States had been challenged to show a distinction between the two cases. This call had been answered by judge Porter, in the following words: "the streets of a town are no doubt what is denominated in our law, public places, and they are protected from change and alienation, by all the rules which apply to things of this description. But the power of the grantor over them, even if he should be the king, is, in my opinion, much more limited, than that he possesses over other things of the same kind. So long as the town remains unincorporated, and he retains the power of regulating its police and government, by laws and ordinances, he may modify, abridge or enlarge the streets, but he cannot deprive the inhabitants of the use of them; and for an obvious reason. Streets are indispensable to the enjoyment of urban property. Without them a town could scarcely be said to exist; the inhabitants of it would be as prisoners in their own houses. It may, therefore, be readily admitted, that the sovereign power of no country, could deprive the owners and occupants of lots and houses, of things indispensable to the use and enjoyment of the property sold or conceded; without violating the plainest dictates of justice, and the general principles of law, applicable to all other

cases of the same kind. But its inability to do so would not proceed from their being destined to public purposes ; but because, without them, the property granted could not be enjoyed. Just as, on the same principle, an individual who granted a portion of his land, which could not be reached but by passing over other portions of it, would be considered as having conceded to the grantee, the right of way over the part retained. It is a well settled principle, that whenever an individual or the law giveth any thing, there is impliedly given, at the same time, whatsoever is necessary to its enjoyment. The limitation, therefore, contended for on the power of the sovereign over streets, may be well conceded to the whole extent pressed in argument, without at all affecting his authority, or his rights over vacant ground not proved to be necessary to the use of private property."

The same opinion shows also, that even admitting that the vacant space in question, had really been dedicated to public use, by the king of France, that such dedication was not irrevocable, nor the land rendered inalienable ; but on the contrary, the dedication might be revoked and the land alienated by the sovereign.

Judge Porter also arrives at the same conclusion, as to the want of title in the city, on other grounds. He shows that, unless words can make or change things, no part of the ground left between the city and the river, can be regarded as a quay, save that which was prepared for the reception and discharge of vessels, by the creation of the levee or artificial embankment. And admitting that this space was really a quay, he then argues, that only so much of it as is actually necessary to the loading and unloading of vessels, is properly to be regarded as public.

Thus far judge Porter had chiefly considered the case on the law of France. He then examines the law of Spain, which brings him to a result equally fatal to the claims of the city.

Judge Matthews, who concurred in this opinion, supported some of the points above referred to, by additional arguments and authorities. This decision, though not obligatory on this court, is entitled to the greatest respect. The case turned on the French and Spanish laws, with which this court is not particularly conversant. The state judges were familiar with those systems, and, as they must, no doubt, have been disposed to incline, on all doubtful questions, in favour of the city, their decision may be regarded as of the highest authority. It should also be mentioned, that the same decision in effect,

though the cases were different in their circumstances, had been previously made by the supreme court of Louisiana, in the cases of the grants to Mentzinger and Liotaud, whose claims before the commissioners are also among the proofs in this cause.  3 Martin 296 ; Chabot v. Blanc, 5 Martin.

Independently of the decisions of the local tribunals, it is submitted, that on the facts stated in the record, it is apparent that the city has no title.  No law of France or Spain, nor any grant from either, nor any documentary evidence of any kind, is introduced or appealed to by the city, for the purpose of showing that the ground in controversy had ever been expressly granted to the city.  The right of property depends on the state of the title in October 1800, when the country was retroceded by Spain to France ; and in the absence of any written declaration of the right to this property, the presumption of law is, that it belonged, at that time, to the sovereign, as a part of the national domain.  The circumstances appealed to by the other side, for the purpose of overcoming this presumption, and showing title in the city, must be referred to the laws by which the territory was governed prior to 1800 ; that is to say, the laws of France, from the settlement of the county, until 1769, when the Spanish laws were put in force, and the latter from that time.

The counsel for the city, in the pamphlet handed to the court as a part of the opening, whilst they admitted that the city had never received a grant from the French crown, yet contended, that by the designation of the premises on the plans of the city as a *quay*, and by the possession and enjoyment set forth in the case, the land was as completely separated from the domain, and as clearly vested in the inhabitants of the city, as if there had been a formal grant from the French crown.  In answer to this, the attorney-general contended, that the most that could possibly be made of the designation on the plans, and the other facts relied on by the city, was, that the vacant space in question had been dedicated to public uses—they did not even begin to show a title in the corporation.  By the French law, as it existed at the time the city was laid out, and from that time until the cession to Spain, quays and other public places in cities, belonged to the crown, as a part of the public domain.  Domat's Public Laws, book 1, tit. 6, sec. 1, art. 7 ; Encyc. Math. Jurisprudence, art. Domaine.

As to the extracts from the Partidus and other Spanish laws, they

only show that cities might, by the law of Spain, hold commons and other public places; they do not prove that cities, under that law, could hold the absolute titles in those places, nor any title whatever in the soil; and, above all, they prove nothing as to this particular case.

The law as to increases of land formed by alluvion, was, no doubt, correctly stated, by the opening counsel; but it could not help the city in the present case. The increase, by alluvion, was on the outer side of the levee, which had been greatly widened by it; whereas, the ground now in controversy, is wholly on the inner side. Besides, the increase by alluvion belongs to the owners of the soil to which it is added; and as the city corporation has been shown not to be the owners of the soil, they have no title to the increase, not even to the use of it. Livingston in 5 Hall's Law Journal, p. 120, 150, 172, 188. Nor is there any hardship in this; because the levee has been widened by revenues granted to the city by the crowns of France and Spain.

Title by *prescription* is also set up. But by the French law there can be no title by prescription against the crown, in any case, unless it be immemorial. Alard v. Lobau, 3 Martin, New Series, 293. And such things as are destined to common or public use, such as banks of rivers, &c. cannot be acquired by prescription. Domat's Civil Law, b. 3, tit. 7, sec. 5, art. 2. And though, by the Spanish law, cities and towns may acquire, by prescription, a title to the *use* of land for commons and other public places, they cannot acquire an absolute title in that way. But there is no such long continued and uninterrupted possession here, as is required by the Spanish law, to constitute a title by prescription. (For the rules of the Spanish law on this subject, see Institutes of the Laws of Spain, quoted in White's Compilation, p. 70.)

The opening counsel had contended, that if the right of dominion, the title, did really remain in the sovereigns of France and Spain, whilst they owned the country, yet that the title was held by them subject to public uses; and that, by the cession to the United States, and by the incorporation of the city of New Orleans, by the territorial legislature, under the authority of the United States, the title and dominion, subject to such public use, became vested in the city corporation. The answer to this argument will be found in the act of incorporation itself. It gave the corporation a capacity to acquire lends according to our law of corporations; and it vested in them

all the estates, whether real or personal, which theretofore belonged to the city of New Orleans, or were held for its use by the cabildo, under the Spanish government, or the municipality, after the transfer of the province to France, and which had not been legally alienated, or lost or barred; but it gave to the corporation no new title to the land in question. The territorial legislature, indeed, had no power to grant such a title. The act of the 26th March 1804, which organized the territorial government, expressly declared that the governor and legislative council should have no power over the primary disposal of the soil. The act of incorporation, therefore, merely confirmed to the new corporation the old title, and we are, therefore, necessarily turned over to the former question.

The attorney-general next contended, that the absolute title to the premises in dispute had been vested in the United States by the treaty of cession of 1803. This was the conclusion of a majority of the court in the case of De Armas and Cucullu v. The City of New Orleans, before cited; and there are in the present record some evidences of title not presented in that case; and various arguments applicable to this point, not noticed in the opinions of Judges Porter and Matthews, may also be suggested. Title to land in Louisiana, as well as in other parts of this continent, was founded on discovery. Johnson & Graham v. M'Intosh, 8 Wheat. 593. The whole soil, subject only to the right of Indian occupancy, was treated as a part of the national domain. In September 1712, Louis XIV. granted to Anthony Crozat the commerce of Louisiana for fifteen years, with the mines, &c. in perpetuity. 1 Martin's History of Louisiana 178. White's Compilation 159. This grant extended the edicts and ordinances of the realm, and the customs of Paris, to Louisiana. In August 1717 Crozat surrendered his grant to the crown, and in the same year the commerce and government of Louisiana were granted to the Western Company for twenty-five years. The lands of the territory were also granted them in perpetuity. 1 Martin 198, 199. The site of New Orleans was selected in 1718 by Bienville, who had been commissioned as governor by the Western Company. 1 Martin 204, 244. The designation of the *quay*, and the general plan of the city, was made under the authority of the Western Company. But though that company held the title in all these lands at that time, this does not alter the case. They represented the sovereign, not only in their capacity to make grants of land, but also in the regulation of commerce In designating the *quay*, they acted in the

latter character, as well as in the former: and the case must there-
fore stand on precisely the same ground as if the city had been laid
out by the crown, at a time when the whole title was in it.  The
Western Company surrendered their grant to the king in January
1732 (1 Martin 287), and the French crown was thus re-invested
with its original title, and all lands not previously granted were re-
united to the public domain, and so continued until 1769; when the
secret treaty made in 1763, by which Louisiana was ceded to Spain,
was promulgated, and the territory delivered to the Spanish authori-
ties.   1 Martin 329; 2 Martin 2.   The premises in question having
never been granted to the city, and being a part of the public domain
at the time of this treaty, passed by it to the crown of Spain, by
which it was held as a part of the domain belonging to that crown,
until 1803, when the treaty of retrocession, made at St Ildefonso on
the 1st October 1800, by which Spain ceded Louisiana to the French
republic, was carried into effect.   2 Martin 182.   The title to these
premises being in the king of Spain, and not in the city of New Or-
leans, at the time of the execution of the treaty of St Ildefonso, it
passed to the sovereign of France as a part of the national domain;
and under that treaty the French republic acquired, to use the lan-
guage of their cession to us, "an incontestable title to the domain,
and to the possession of the said territory."   The title thus acquired
by France, together with the sovereignty of the country, passed, by
the treaty of cession of 1803, to the United States.   The second
article of this treaty declares, that in the cession are included "the
adjacent islands belonging to Louisiana, all public lots and squares,
vacant lands, and all public buildings, fortifications, barracks, and
other edifices, which are not private property."   This enumeration
was probably unnecessary, but seems to have been inserted from
greater caution, and as if with a view to this very question.   It is
evident, from the language of this article, that public lots and squares
in cities were not regarded as the property of the cities, but as the
property of the crown; and as there were no such public lots and
squares within the territory of Louisiana, except in the cities of New
Orleans and Natchez, public places in those cities must have been
specially intended by the framers of the article.   The vacant space
now in controversy, was a public lot or square within the meaning
of the treaty; and as it has been decided by the highest court of the
state of Louisiana not to be the property of the city, it necessarily
passed to the United States.

It was contended in the opening, by the learned counsel for the city, that even admitting that the sovereigns of France and Spain had the title to, and the control of these premises, and that the same passed to the United States by the treaty, it did not necessarily follow, that the United States yet retain such title and control ; and it was argued, that on the creation of the state of Louisiana, that state became invested with all the title and control of the former sovereigns. This argument was attempted to be supported by the third article of the treaty of cession, and the act admitting Louisiana into the union ; and it was said, that if such was not the case, the inhabitants of the ceded territory would not possess all the rights and advantages of citizens of other states; nor the state be placed on an equal footing with the other states. But the third article of the treaty relates only to the rights which are to be enjoyed by individuals ; and the act of congress of the 26th of February 1811, authorizing the formation of a state government, required as a condition, that the people of the proposed state should for ever disclaim all right or title to the waste or unappropriated lands within the territory ; and that the same should be and remain at the sole and entire disposition of the United States. This condition was acknowledged in the state constitution, and reiterated in the act of the 8th of April 1812, by which the state was admitted into the union.

The ownership of the premises by the crowns of France and Spain as a part of the public domain, and the consequent title of the United States, are supported by many acts of ownership, and by frequent recognitions of the city authorities ; the most important of which are enumerated in the agreed statement of the facts proved, and of evidence offered by the plaintiffs. It was said by the opening counsel, that these were not evidences of title, but only evidences of the exercise of a claim of title, and of acquiescence by the city authorities. That remark was a mere solecism ; for what is evidence of the exercise of ownership, especially when acquiesced in by the adverse party, but evidence of title ? Proofs of this sort are the very highest evidence of title ; and they, therefore, deserve the particular attention of the court. In the present case, the acts of ownership on the part of the crown, and of acquiescence on the part of the city authorities, commence from a very early date.

Among the proofs produced by the corporation, are the papers relating to fourteen sales, and other documents ; which were introduced to prove that the houses in the front row of the city were

described as bounded in· front by. the quay ;· and, also, to show that the city lots extended no further. Among these ·sales there are several of lots on the quay ; not bounded by the quay : but, as would seem from the descriptions, actually situated on·it, and forming part thereof. The grant to Broutin is for a lot " on· the wharf," to be. held by him and his heirs and assigns as his own property ; " subject to the services which may be imposed by his majesty by reason of his domain :" and on certain conditions to be performed by him, " under the penalty of the·said lot being re-united to his majesty's domain."

Barracks were erected on the premises by the French government before the year 1757; and the troops were frequently exercised thereon. The commercial use of the quay was also under the authority, and for the benefit of the crown, or those who represented it, as contradistinguished from the city. From 1769 to 1803, there are various acts of ownership on the part of the Spanish crown ; most of which also involve a recognition by the city authorities of the title of the crown. The barracks erected by the French government, and the use of the premises as a parade ground, were continued. On the 22d of February 1770, governor O'Reilly, acting in the name, and with the authority of the king, granted to the city, among other things, a tonnage duty to be paid by vessels and boats coming to the city, to be appropriated to the reparation of the levee. Several imperfect grants, and two complete. titles were also made by the Spanish governor, as the representative of the crown, between 1788 and 1803, of portions of the quay ; which grants, after the cession, were confirmed by acts of congress. [The attorney-general here reviewed the cases of Magnon, Chessé, Bertrand, Urtubuise, Mentzinger, and Liotaud ; and laid great stress on the grants by the Baron de Carondelet to the two latter ; and on the allegations in their grants,·that the lots granted were part of the royal lands, &c. As to Magnon's case, he insisted, that the opinion of the attorney-general merely spoke of the proposed grant as a thing that might be disagreeable to the city council : but not as an act that would violate their rights.] In three of these cases (those of Mentzinger, Bertrand and Liotaud) the title thus derived from the United States was held valid by the supreme court of Louisiana. Prior to 1793, the. Spanish government erected a customhouse and a tobacco warehouse on the premises; the former of which existed at the period of the cession to the United States, and has been since kept up by them.

[New Orleans v. The United States.]

The use thus made by the governments of France and Spain, was all that the nature of the subject and the circumstances of the times required or admitted ; and the facts that some small buildings were erected by the city authorities during this period, and that the inhabitants of the city sometimes used it as a common, are not inconsistent with the title and ownership of the crown.   There is no instance, from the laying out of the city to the present day, until the attempt which led to the present suit, of any pretence on the part of the city authorities that they were capable of granting these lands; and until the late cases in the state courts, they never alleged that the crowns of France and Spain before the cession, and the United States since, had not the power to make such grants.

The acts of the parties after 1769, show beyond controversy, that in the judgment of all the Spanish authorities, the land in question belonged to the crown, and not to the city.   And even were it proved, (which is not admitted) that according to the French law, the ground between the lots appropriated as private property, and the water, was all called *quay*, and was the property of the city authorities ; yet if the government of Spain, after the country passed under that jurisdiction, deprived the city of this property, and held and used it as the property of the Spanish crown, this court will not now revise the decision of the Spanish tribunals, and inquire whether the title to this ground was justly or unjustly taken from the city authorities and vested in the crown.   But they will recognize and support the title as it existed and was recognized by the proper tribunals at the time of the cession to the United States.   And as it is not pretended that any change in the title took place between the times of the cession to France, and the transfer by France to the United States, the rights of the United States, and of the corporation, must be tested by the state of the title, as understood and maintained by the Spanish authorities, at the time they ceded the country to France.   For if the property originally belonged to the corporation, or municipal authorities, and was unjustly wrested from them, and converted to the use of the Spanish government, as public property, the courts of the United States will not revise and reverse decisions which the despotic character of the Spanish government authorized and sanctioned.   Those decisions may have been made in direct violation of the principles which regulate and protect private property, according to our institutions ; but they are, nevertheless, binding on the parties affected by them.

[New Orleans v. The United.States.]

Since the cession to the United States, and the incorporation of the city, the former has claimed, with the acquiescence of the latter, the full ownership of these premises. In 1806, the corporation presented, under the act of the 2d of March 1805, to the register and commissioner of the eastern land district of the territory of Orleans, a claim to certain lands in the vicinity of the city, alleged to have been granted at the time the city was established, to the inhabitants of the city, to be used as a common for ever, and prayed for their confirmation. This claim seems to have been understood by all parties, as embracing the land now in controversy, as well as other land. The board rejected the claim as to certain lands occupied for fortifications, and also as to all "lots and vacant parts of land between the said fortifications and the city, and within and in front of the city, between Levee street and the river." This decision was acquiesced in at the time; and if the premises in question had been as clearly embraced in the petition, as they are in the decree of the commissioners, the decision would have been conclusive. It may be said, that the premises now in dispute were not embraced in those proceedings; and if this be so, the fact furnishes strong proof that at the time the claim was made, the city authorities did not suppose they had any title to these lands. Had they then claimed any such title, they would, no doubt, have preferred a claim for the confirmation thereof, under the act of congress of the 2d of March 1805.

In 1812, the city council passed a resolution directing an application to be made to congress, for the grant of a lot on the *quay*, to be used for the erection of a fire pump; in which resolution, they expressly admitted that the vacant space between the river and the front line of houses, could never be sold or rented to private individuals, or disposed of, except for objects of public utility; and the whole resolution, and the application made to congress, proceed upon the admission, that the government of the United States was alone competent to make a grant of any portion of these premises.

Pursuant to this application, congress, by the act of 3d April 1812 (4 Bioren & Duane 400), granted to the corporation of the city of New Orleans the use and possession of a lot between Levee street and the high road; with a proviso, that if the same should not be occupied for the purposes indicated, within three years, or should thereafter cease to be so occupied for the term of three years, the right and claim of the United States should remain unimpaired. The act of the 20th April 1818, vol. 6, p. 346, "authorizing the dis-

posal of certain lots of public ground in the city of New Orleans and town of Mobile," and the act of 30th March 1822, vol. 7, p. 24, supplementary thereto, were both passed at the solicitation of the city corporation, and both contain similar recognitions of the title of the United States. The act of the 28th February 1823, vol. 7, p. 120, in relation to the lot on which the navy storehouse is situated, and which is thereby granted to the corporation, admits of the like remark. The act of the 21st April 1806, vol. 4, p. 61, granting to the corporation of the city of Natchez the right of the United States to all the land lying between the front street and the Mississippi, on condition that the premises should neither be cultivated nor occupied by buildings, but that it should be planted with trees and preserved as a common, may also be referred to as evidence of the general understanding, that the title in vacant places of this sort had, by the treaty of cession, been vested in the United States.

It is also matter of public history, of which the court will take judicial notice, that during the pendency of the present writ of error, the corporation of New Orleans has petitioned congress to grant to it the very lands now in controversy, and that the argument of the cause was delayed for one or two terms, for the express purpose of enabling the corporation to present this application, and to obtain a decision thereon.

In accordance with these admissions, has been the actual conduct of the parties ever since the cession to the United States. In 1819 the United States erected on the *quay* a building which is yet occupied by them as a customhouse and courthouse; and they also caused the same and the adjacent grounds to be enclosed with a fence; and if they have not had the exclusive use of the remainder of the premises in controversy, neither has there been any such use on the part of the corporation. Under these circumstances the possession follows the legal title, and was therefore in the United States at the commencement of the suit, as alleged in their petition.

II. If the corporation of New Orleans has any legal interest in the premises, it is not such an interest as can authorize the absolute sale of said premises, in lots, to individuals; because the interest of the city is, at most, a mere servitude for the benefit of the inhabitants of the city, or of the public generally, whilst the title to the soil is vested in the United States.

In discussing the first point it had been shown, that the corporation of New Orleans had no title to the soil; and on the most liberal

construction of the facts, and with every disposition which might be felt to maintain and extend their interests, it would seem to be impossible to go farther than the opinion of chief justice Martin, who merely contended that the quay had been irrevocably dedicated to public use for the benefit of the inhabitants of the city and the public at large, and that the property was therefore put hors du commerce. Indeed, the greater part of the opening argument had been directed to this point; and if nothing more than this has been established, then it is plain that the decree must be affirmed. Suppose the lands to have been dedicated to public use, and the city corporation to have the legal title to such use, yet the fee charged with this public use, must have remained in the crowns of France and Spain, and from them must have passed to the United States, who, as the present owners of the soil, have a right to enjoin the city corporation from proceeding to sell for its own exclusive benefit. Supposing the city corporation to have the legal title in the servitude; it is plain that this does not authorize it to sell the whole estate, appropriating the proceeds to its own use, and that too without the consent of the owners of the fee. On the contrary, according to the rules both of the civil and common law, if the property ceases to be used for the purpose to which it has been dedicated; if the servitude is abandoned or extinguished, the whole estate reverts to the owner of the soil, whose title then becomes absolute. In such case, the original owner, or those who have succeeded to his rights, will hold the land freed from the incumbrance of the servitude.

III. If the corporation has any title to the soil, then the same is charged with a servitude held by the United States for their own use, and for the use of the public generally.

If upon any ground it should be held, that the title to the soil has passed to the city corporation, then, as it is admitted and contended by the counsel for the city that the lands were originally designed for public use as a *quay*, the question will arise, by whom is this servitude held? According to the law of France (as already shown), all public places, including *quays*, are held by the crown for the use of the public. This title passed to the Spanish crown, and was retained by it, until retroceded to the French republic. By the treaty of cession of 1803, this servitude passed to the United States; and until they grant it to the state, or to the city, they must continue to hold it, provided they have a capacity to do so under the constitution of the United States. That they had such a capacity during the

[New Orleans v. The United States.]

existence of the territorial government, cannot admit of doubt; and they must now have the same capacity in this respect, in regard to Louisiana, which they possess in regard to the other states. Under the powers to lay and collect imposts, and to regulate commerce, they may undoubtedly acquire and hold wharves, storehouses, &c. And in a great commercial city like New Orleans, what constitutional difficulty is there to prevent them from holding, for the purpose of facilitating the collection of imposts and the regulation of commerce, the use of a tract like the quay? It might not be necessary or expedient in ordinary cases, for the United States to acquire a servitude of this sort in so large a tract; but their power to hold such a title cannot depend on the extent of the tract. Besides, although the territories adjacent to the Mississippi river have been formed into states, the United States yet have an interest in the navigation of the Mississippi; and have so lately as 1824 (Laws U. S. vol. 7, p. 329, 331), granted lands to the parishes of Point Coupee and West Baton Rouge, for the purpose of keeping up levees on the bank of that river. It is therefore submitted, that the servitude in these lands may be well held by the United States, for the benefit of the citizens of the United States, and of all others who may wish to use the same for the purposes of a quay.

Mr Livingston, for the appellants.

It has been truly said by the attorney-general, that this is a suit of importance. Whether we consider the value of property actually depending on its decision, or of that which may be involved in the principles which the decision may establish. But to the appellants, its importance is far greater than any considerations of pecuniary value could give to it. Decided in favour of the United States, the decree gives them, not only the land contended for in this suit, but all that lying in front of the city. It cuts off from all access navigation, the second commercial city of the union; shuts up their streets; renders their wharves useless; and, worse than an invading enemy, invests them with a blockade that their valour can never raise. Well, therefore, might the attorney-general call it an important cause. But, happily, importance and difficulty are not synonymous. These fatal results of a decree against the appellants, may, I think, be avoided by a reference to two cases lately decided in this court; those of Cincinnati, and Pittsburgh: to which the attention of the court has been already drawn.

The facts are essentially the same in character; or where they differ, they are stronger in our favour. The law by which they are to be governed, is the same; call it civil or common law, it is founded on the principles of justice, which never vary; and the only difference between the two systems is, that the rules which have been established by the decisions of this court, were, under the laws which govern this case, matter of statutory enactment.

Objections have been raised to the form of the action, which it will be necessary to remove before we examine the merits. It has been said that the counsel who opened this case erred in calling it a suit in chancery, for the following reasons: it is not so entitled; no process of subpœna was issued; and a jury was once impanelled to try the issue of title. This court will not regard the want of form, where it is not essential to the great ends of justice. If the words, therefore, "in equity," are not placed at the head of the record, but the whole scope of the petition is to obtain an equitable relief, the omission will not be fatal; those words can be no more than a direction to the clerk, on what docket to place the cause. The want of a subpœna is supplied by a summons, and the appearance cures all defects of mesne process. As little can the objection avail, that a jury had once been summoned; for feigned issues to try facts are among the ordinary proceedings of courts of equity.

But it is objected, that here the relief prayed for is not equitable, but one given by the common law of the country; that the perpetual injunction prayed for by the bill and given by the court below, is nothing more than the interdict of the civil law; and authorities are taken from a pamphlet, published some years ago, to prove the position: and that the author of that pamphlet, now the counsel for the appellant, proved, as it is said, conclusively, that a suit commenced in the same form with this, having the same object, and in which the same relief was obtained, was not a suit in chancery. All this is true. But an essential circumstance is forgotten in the statement. The suit in question (Gravier v. The Corporation of New Orleans) was brought in the territorial court of Louisiana, under the first grade of government; a court, proceeding according to forms, essentially those of the civil law; governed in its decisions by the rules of that law: and, consequently, knowing no distinction either in its decrees, or its modes of procedure, between equity and common law. The object of Gravier's suit, was to be quieted in his possession: a relief whic if the suit had been in a chancery court, would have been

given by perpetual injunction; and if according to the laws which governed the territory, by the equivalent remedy of a perpetual interdict. The same remedy was given, by the territorial court, that would have been given by a court of equity, had the distinction been known to the laws of the country; but it was not known; therefore, the proceeding in that case, was not a chancery proceeding, but one in the ordinary execution of the powers of the court. Here, on the contrary, the suit is brought in a court having chancery jurisdiction; the relief sought is an equitable relief; and it will not surely be required, that authorities should be cited to prove, that whatever may be the laws of the state in which a court of the United States is situated, that court has equity jurisdiction: and although, the courts of such state might give relief, according to the forms of the common law, in cases strictly of equity jurisdiction; yet those of the United States are bound to class them according to the nature of the remedy sought for.

The reference to the pamphlet, from which the argument has been drawn; the flattering terms in which the attorney-general has been pleased to speak of it; and the possibility that, in looking at it, the court may recur to other parts then those immediately relating to the question before them, oblige me to ask their indulgence for a single observation; irrelevant, it is true, to the case, but which I am happy to find an opportunity of making. That pamphlet was written under circumstances in which the author thought, and still thinks, he had suffered grievous wrongs; wrongs which he thought, and still thinks, justified the warmth of language in which some part of his arguments are couched; but which, his respect for the public and private character of his opponent, always obliged him to regret that he had been forced to use. He is happy, however, to say, that at a subsequent period, the friendly intercourse with which, prior to that breach, he had been honoured, was renewed; that the offended party forgot the injury; and that the other performed the more difficult task (if the maxim of a celebrated French author is true), of forgiving the man upon whom he had inflicted it. The court, I hope, will excuse this personal digression; but I could not avoid using this occasion of making known, that I have been spared the lasting regret of reflecting, that Jefferson had descended to the grave with a feeling of ill will towards me.

The opening counsel has also been supposed to have fallen into another error, when he stated, that the object of the suit was the

recovery of the absolute ownership of the property for the United States. That he has not erred, is evident from the words of the petition: they claim the dominion and possession, the union of which amounts to absolute ownership.

It is true, as has been argued, that there are cases in which the court may modify the decree according to the circumstances which are proved; but this can only be when the proof is in conformity with the case alleged: when it is not, it destroys the force of the rule that the allegata and probata must agree; and as a consequence, that the decree must conform to both. Here it supposed that the court may either decree the property in full dominion to the United States, or that they may establish the property in them, with a servitude to the city, or give the property to the city with a servitude to the United States; but neither of these kind of titles are put in issue, neither of them are alleged in the pleadings; and, as will be shown, neither are proved by the evidence. They cannot recover a servitude by asking for the fee; and if the land in the hands of the corporation is subject to the servitude of a common use in favour of all the inhabitants of the United States, the government of the United States cannot enforce that use by a suit in their name.

The demandants then in this, as in all other cases, must prove their case, and prove it as stated. They allege dominion and possession; both must be proved if they can have the relief prayed for, viz. a perpetual injunction to quiet possession. But if they do not show actual possession, how can they be quieted in it? If they do not show property, there can be no equity in their demand; for chancery will never interpose in favour of an illegal possession: actual possession has not been attempted to be shown, and an actual adverse possession for more than one hundred years is expressly admitted.

No position can be clearer, than that for this defect of proof alone, the bill must be dismissed; and I might add, if it were necessary, that equity will not interfere to quiet a possession until after the title has been settled. But we do not desire a decree on this point, which would not put an end to the controversy. We are prepared to show conclusively that the United States have no title to the land or to a servitude on it; and that the whole title is vested in the defendants, subject to uses, for the observance of which they are amenable to the laws, to the courts and to the authorities of the state exclusively.

1. The title of the United States. This rests on the second article of the treaty ceding Louisiana.

That gives to them the dominion of the province of Louisiana, and enumerates as included in the grant, public squares, vacant lands, &c., not private property. The general transfer would have been sufficient to invest the United States with the sovereignty of the country. But to show that no right to the property contained within the limits of the cession was retained, the enumeration of vacant lands, public squares, &c. is made. Now in this enumeration the grantor cannot be supposed to give more than he had: therefore if the premises are included in the description of public squares, can it be supposed that he intended to convey, or could convey to the United States that which they claim; not only the dominion (which supposing it to be the sovereignty only and which no one in his senses would deny), but also possession, and property in that which had been dedicated to public use? The term public square, by its very name proves that it is a place of that description, not a domain subject to be disposed of by the sovereign. But that there might be no room for doubt, no contradiction between this part of the treaty and that which secured the inhabitants in their rights and property; the restriction is added, that that only was conveyed which was not private property.

The terms of the treaty then gave no title to the premises; and to succeed, the plaintiffs must prove that they were *vacant lands;* but these terms are well understood, and by decisions of this court, have been adjudged not to mean property in a town: and by the admission in this case, the property in question is acknowledged to have been in the use and occupation of the inhabitants of the city, ever since its foundation.

Failing in the attempt to bring the case within the bounds of the treaty, the United States have recourse to a decision which it is thought secures it to be within its spirit. The decision of the supreme court of Louisiana is relied on as decisive, if not binding as authority, conclusive as authority, and convincing as argument. It will be examined in all these points of view, with the respect due to the learning of the judges who pronounced it; which is acknowledged to be great; but at the same time, with the freedom that duty to my clients requires.

It is not contended that we are concluded by this decision. It was not made between the same parties, and although for parcel of

the lands now in dispute, was not given on the same evidence; and these circumstances derogate much from it, considered only as a precedent. There are others which when properly considered, weaken its force, even as argument.

This court has frequently expressed its respect for state decisions, and its disinclination to oppose them; but as their reasons are understood, they will give them effect under the following circumstances:

I. Where disturbing them would unsettle titles bona fide acquired.

Here no such effect would be produced; the few claims on this property having undergone legal investigation, and being settled by decisions that do not admit of reversal.

II. The second requisite is, that the state decisions have been uniform. In this the case of the United States is remarkably defective. Several decisions have taken place in the supreme court of the state prior to that of De Armas; in all of which, as I shall show, opinions have been given directly at variance with those established in that case. The first of these is The Corporation v. Gravier, 11 Martin's Rep. 625; of which these were the circumstances: Gravier had laid out his plantation into a suburb, and made a plan on which he had laid out a square, on which he attempted afterwards to build: he was opposed by the corporation; and the court decided, that the designation on the plan was a sufficient dedication to public use to prevent any exclusive appropriation being made of it by the former proprietors.

The next is found in 3 Martin 303. In that also we have the authority of Martin (one of the judges) for the fact that the judges fully recognised the doctrine, that places dedicated to public use could not be disposed of by the crown; and that if the corporation had then produced the plan of the city which is in evidence here, the judgment would have been different; and that if a grant had been made by the crown, it would have been declared void. (See Martin's opinion, and the printed case, Mayor, &c. v. De Armas, 46.)

In the case of Chabot v. Blanc, 5 Martin, the same question arose, and the same intimation given by the court, that if a plan of this had been produced showing the locus in quo to have been dedicated to public use, the grant of it by the king would have been declared void.

These two cases were decided before the corporation had discovered the maps, of which authenticated copies are now produced. In both the court formed their judgment in the absence of this proof;

[New Orleans v. The United States.]

in both they deny the right of the crown to dispose of the property, if the dedication could have been proved by the production of the plan: in both the premises were part of the quays now in dispute: therefore, in both these cases, as well as in the one first cited (Gravier v. The Corporation), the principle involved in this case is fully established; and no decision of a contrary nature, before that of De Armas, having been produced, the state authorities, so far from being uniformly against us, are three to one in our favour; and all these three appear to have been the unanimous opinion of the court: whereas, this is decided by two judges against the opinion of one.

De Armas's case then stands alone: the decision must be established or fall, by the comparative strength or weakness of the arguments; and to support it, we have them fortunately at full length. The court will compare those of the dissenting judge (Martin) with those of the two judges forming a majority of the court.

So much reliance is placed on this case that it must be closely examined. That part which investigates the validity of the confirmation made by the United States, does not apply here; and need not be examined. The presiding judge, as to the principal point, the property in the corporation, refers to the argument of his associates; with whom he agrees, and therefore touches very lightly upon it. He however takes for granted, a fact that is disproved by the admissions in this case; viz. that the greater part of the space denominated a *quay* on the plan, had never been used as such. p. 59. He then enters into an investigation of the true meaning of the word *quay*, which he concludes must be an artificial work; and as the space between the houses and the river was natural soil, it could not come within that description. In another part of my argument, I will show that this philological inquiry is quite useless in this case, and that the learned judge has fallen into an error, which shows that it is so. For, he says, " perhaps it may be required that some effect should be given to the word quay, inserted on the plan. This may be done, by allowing it in reference to that part of the space on which it is found; which was a quay, according to the meaning of the word, as generally received; i. e., the levee which existed on the bank of the river, and the shore between the exterior of the levee and the water." Now, if the place on which the word is written in all the plans is to be considered as the quay, then all the definitions which require that it should be an artificial work, are incorrect: for a glance at the plans will show, that wherever it is

Written, it is on the vacant space between the artificial levee and the houses.

Another ground on which the learned presiding judge rests his opinion, has, I confess to my no little surprise, been adopted by the attorney-general. It is, that the United States, because they have the right to establish ports of entry and regulate commerce, have that of regulating quays as an appendage to the ports, and take upon them the police of wharves in all the states of the union. The argument of the attorney-general does not, as I understand him, carry this right further than the port of New Orleans; but his doctrine does: for if the right be derived from the constitution, it must apply to all ports in the union; and the judge expressly goes this length. Of all the constructions of constitutional powers, given to the federal compact, this would be the most dangerous and mischievous in its exercise, and the least founded in the words or spirit of the federal compact. I shall refer to it again, in reviewing the arguments of the learned counsel opposed to me. But grant the right, and it is of no use, to establish the claim of the United States to the title of the land. Let them, if they can, find the authority in the constitution to make laws for regulating wharfage and drayage, and cleaning the slips and docks. Let them appoint scavengers, and exercise all the jurisdiction which this construction would give them. They are not advanced a step in their claim to the property of the soil, which they must establish before they can succeed in this suit.

The presiding judge having referred to the opinion of the associate, who concurred with him, for the argument, and that argument having been expressly adopted by the attorney-general, it must be respectfully examined.

It divides itself into two branches: to show, first, that the city had no title to the premises. Secondly, that the land was not set apart and dedicated to public purposes.

The first head is supported by the learned judge, under what I respectfully consider a mistaken view of the law of France. p. 64. He lays it down broadly, that by those laws "a city or town could not acquire right or title to the soil of immovables, or to the use of them without letters patent from the king." But the authority quoted in support of this, shows, I think, that by the very fact of establishing a town, the right to hold real property is acquired as a necessary consequence. That authority declares, that no one can establish communities but the king, and adds. "that it is a

consequence of this right also, to permit them to hold real and personal property for themselves." And afterwards, " these communities cannot possess immovables, without the permission of the former." To this there are several answers, all equally conclusive. First, the authority does not require letters patent, or any letters whatever, from the king, for the establishment of a town; it requires his permission only; and that permission may be proved by any legal evidence whatever. In the present instance, the grant to the West India Company, by whose act the town was laid out, is sufficiently broad to cover such permission. It gives them the land in allodial tenure, with extensive powers to carry on trade, and make establishments, build forts, sell the lands, &c. And the government gave its sanction to the location and plan of the town, by the employment of its own officers and engineers: and even if that work had been done solely by the act of the company, the plan was ratified by receiving it into the public archives, and afterwards more fully when, in 1832, it received the surrender of the charter, and continued the government of the city under the original plan. If, then, the city was laid out by permission of the king, according to the plan produced, or even if he only ratified such plan, and governed the city by his officers, according to the extent and order of such plan, no other permission was necessary to vest in the city the premises in question; for those premises are part of the city, not a distinct property, acquired by it; which, according to the authority, required letteres d'amortissement, to enable them to hold it. And the want of this distinction causes the error in the learned judge's opinion. For can it be doubted, that after giving permission to lay out the plan of a great city, destined, according to the sanguine expectations of the times (expectations more than realized in our day) to be the emporium of extensive commerce, the capital city of an immense region; after designating on it a capacious harbour, commodious streets, public squares, sites for public buildings, and above all, that, without which, the whole would become useless, commodious quays securing to it a free access to the river and the necessary facilities for lading and unlading of merchandize; is it possible to suppose that a separate grant should be required of all these component and indispensable parts of a city, to enable the inhabitants to enjoy them? Whatever letters patent, then, might be necessary to enable communities to acquire real property, after they were created, none could, in the nature of things, be necessary to give them the

enjoyment of those parts of the city itself, which were destined for public use ; such as their quays, streets and squares.    Are they not integral parts of it ? and if so, does not the permission to create a city, by the king, and a fortiori, his creation of one himself, include this necessary grant ?

But suppose the grant necessary, and that the premises were not part of the city, is it not necessary to be presumed that such grant was made ?    It is a necessary presumption, when a thing that may be acquired by prescription, has been so long in the hands of the possessor, to give the title.    Here, that proof is before the court. Therefore, it inevitably follows, that whether the laying out of the town is, as I suppose it, a sufficient grant, or whether the nature of the property required a separate grant to convey it, is immaterial. In the one case, the grant is proved ; in the other, its existence is necessarily presumed.

There is on this head alone, an erroneous conclusion drawn from the law of Partidas quoted by the learned judge.    That law (tit. 28, 3d partid.) defines what shall be the common property of the cities, for the use of all the citizens, in contradistinction to that which is held by the magistrates of the city for the common good, but of which the citizens have not the common use; and after enumerating some of them, as the banks of the rivers, the public fountains, the commons adjacent to the town, adds, " and other such like places as are established and granted for the common use." Evidently referring to the use to which the property is appropriated, not to the manner of acquiring it.    The same judge also on this head adds, " that the plans produced in evidence, have never been delivered to the city as a muniment of title."    This appears not quite certain.    Considering the various changes of jurisdiction that the city and province have been subject to, the two successive con- flagrations of the city, and the notorious loss and removal of public documents; the probability, I should think, would certainly be, that where lots were to be sold, buildings erected, and streets located on the ground, a map or plan must necessarily have been in the hands of some local public officer belonging to the community where these operations were to be performed; but wherever it lay hid, whenever its existence was discovered, it must have its legal operation.    What that is to be, is more particularly examined in the second part of the learned judge's argument referred to, and adopted as his own by the attorney-general.

That argument concedes that a destination to public uses in a plan, is a sufficient conveyance of the property to that purpose. That this court has correctly placed the setting off of commons to cities, on the same grounds as that of streets and highways: but, he says, that " although this may be perfectly correct under the common law, yet the decision cannot apply to a case arising under the French or Spanish law." And he thinks that one example will show this. " The supreme court considers," he says, " that the fee may be in abeyance until a grantee exists who can accept it; and that then the grant is irrevocable." This doctrine, he thinks, irreconcilable with the rule of the French law, that no community can have a right to the use of immovable property, without letters patent from the king; or with the Spanish law, which recognises no place as common property for the use of the city, but that which it acquires by grant, purchase or prescription. But, are there any such rules in the French or Spanish laws? I trust, I have shown there are none: and it is worthy of remark, that on this branch of the argument, the rules are greatly extended beyond the authorities which are supposed to have established them. Thus, the text from Domat says, that the king can permit communities to possess property for their use, (pour leur usage), not the use of property, but the property itself for their use. Two very distinct things; one, a right to purchase real property to make their own use of it, the other, to purchase a use or servitude, in the property of another. But the answer to these supposed rules, and to their application, has already been anticipated.

The following part of the opinion is not applicable to the present suit, for it consists solely in an endeavour to establish a right in the king of France, by virtue of his sovereignty and his superintendence of the police of cities, to dispose of the property dedicated to the public use of the citizens; a right which he thinks devolved on the king of Spain, who, as was contended in that case, had made a grant of the land in dispute, part of this quay, to one of the parties in that suit. Now although I should contest every part of this argument, yet supposing that the kings of France and Spain (by virtue of some regal power, which I contend they never had) could dispose of property which they themselves had made part of the public property of the citizens; yet they have not exercised it with respect to the premises now in question: they were handed down to the corporation of New Orleans in regular succession; and if the sovereignty of the

country came in the same manner to the United States, it came to them unaccompanied by the right of supervision over the police of cities, which the argument supposes the king to have possessed.  It came to them limited by the powers delegated in the constitution, and we shall certainly look in vain into that instrument, for a power to interfere with, much less to claim the property which had once been dedicated to public use.

This part of the argument also errs, in stating that the supreme court decided, that merely having a space vacant in the plan of a town, was a sufficient dedication of it to public purposes: all the blocks in the plans we have produced, lying in the back part of the city, are left vacant; they are not subdivided into lots; yet there is no pretence that they were intended for the use of the city; they were left so until purchasers offered for the lots.  Something more is required, if I understand the decisions of the court.  The space, from its situation, must appear to be necessary for the accommodation of the inhabitants (such as that of the land in question), or there must be some evidence of such dedication by written, or even verbal proof; both of which (situation and written designation), be it remarked, concur in the present case.

A material circumstance, however, has entirely escaped attention in the argument, which renders of no avail all that part of it which is drawn from the prerogative of the king to resume his grant or curtail any servitude he may have created.  The land on which the town of New Orleans was laid out, was private property, not the domain of the crown.  It is forgotten, that the province of Louisiana was, after the surrender of the grant to Crozat, granted to the West India Company, to hold in allodial tenure, independent of any feudal rights that might attach to the crown: that they founded the city with the assent of the crown, on their own lands; and when, in the year 1732, they surrendered their grant, the king took only what they had not disposed of.  But they could not, it is conceded, alter the plan, so as to deprive the citizens of any advantage it gave them; therefore the king, who received only their rights, could not.  A word or two on the supposed right of the king.  It is founded on this reasoning.  There is no doubt, it supposes, that the corporate power may, with the assent of the sovereign, change the destination of places originally intended for public use, but which, an alteration of circumstances has rendered improper for that use.  But the king united both these powers; therefore, his will was sufficient to change

the destination. This reasoning appears to me to be built on an incorrect view of the nature of the French laws, relating to the communities or municipalities of towns or communes. No act of incorporation was necessary to create them. The permission of the king, as we have seen, by the quotation from Domat, was sufficient. Once created, they had their rights independent of the crown ; rights of property, and franchises, which he could no more legally invade, than he could the property of an individual. In France, most of the towns held their franchises and property by long usage, which, in general, supposed a royal permission. In their colonies all the towns were created by the same means which were pursued in the present case; the survey under royal authority, or that which it had delegated, and the subsequent government by municipal officers, appointed by the crown or permitted to be chosen by the people. The argument seems to admit in one part, that after an incorporation this union of royal and corporate powers ceased. If then, the survey and plan by royal authority were equivalent under the French to an incorporation under the common law, the argument totally fails. How far it applied to the Spanish law, (more immediately the subject of controversy in that suit), may be judged of by the 1st law, title 16th, of the 7th book of the Novissima Recopilacion; which enacts that all royal grants made or to be made, of the rights or property of any cities, towns or places, shall be declared void.

The same want of attention to the distinction between lands to be granted to a city, as its *propios,* that is to say, lands not for common use but for supporting the charges of the city, and there designated as a component part of the city in its first formation, pervades the argument (p. 73) ; where the viceroys who had the power to assign such propios to new cities, were directed to send to the king an account of what they have thus designated, that he may confirm them, is brought to prove that designation alone is not sufficient, there must be an after grant. But this law speaks of one thing ; our case, and the case before the court in Louisiana of another. A mere designation of part of the royal domain out of the city for the purpose of supporting the city charges, may require a regular grant ; while a mere designation of a part of the city for the common use of the inhabitants may be, and is sufficient without a grant. The distinction between the three kinds of common property that may be held by a municipality, is clearly drawn in the

Spanish law (3 Partidas, laws 7, 8, 9, tit. 28) : one that is common to all the world, such as the port, the shores, &c. ; another for the common use of the citizens ; a third for the expenses of the community, but which last are not subject to the use of the citizens individually, as the others are. These last are called propios, and by confounding the laws relating to these three, we run into inextricable error. The whole of this opinion of the truly learned judge of the supreme court of Louisiana is, however, based on the idea that the dedication to a public use in the plan, cannot operate as a grant, according to the laws of France or Spain ; although he admits that they would, according to the laws which govern the other states. For in the conclusion he admits, that if they had been granted to the city, they would not have passed by the treaty to the United States.

Before I finish my examination of this able opinion, which the attorney-general has converted into a part of his argument, I cannot but make but one general remark on the power which it assumes to be vested in the kings of France and Spain, to resume and dispose of those parts of a city which they had designated for public use in the plans they had made of it ; a power insisted on with respect to a quay, to all the land lying between the city and the river, shutting it up completely from the only means of carrying on its commerce, and which yet it is acknowledged they did not possess with respect to the streets. But supposing, contrary to the fact, this town to have been laid out on land belonging to the king, he gave the streets in no other way than he gave the space in question ; if the one binds him, so does the other. The law by which the city holds is not the mere common law, it is the law of eternal justice, pervading every system, common to every country, and from which every departure is an injustice, and an anomaly. What is given cannot be resumed without wrong, any more than that can be taken which is derived from any other source. King, republic, or individual, who gives a right over a property, can no more resume it than he can seize on that which he never possessed. The designation in the plan meant the same thing in Louisiana under the French law, that it did in America under the common law ; in both it was meant to give a right ; in both that right is sacred.

I have now examined the title set up by the appellees. I have shown that it cannot be supported by the words or the spirit of the treaty under which they claim.

That the state decisions which are supposed to strengthen it are more numerous in favour of the defendant. I hope I do not flatter myself in thinking that the only one in favour of the appellees ought not to be considered as authority; because in some points the cause is different; in others the reasoning on which it is founded is unsound; and because the court giving the decree was divided.

Although in showing the weakness of the plaintiff's title, I have necessarily anticipated many topics which enter into the establishment of ours; yet I must pray the indulgence of the court while I spread it before them in a connected point of view.

The topographical position of the lands in dispute has been so frequently described, and is so accurately laid down on the plans which are before the court, that no further description is necessary.

The following historical facts are material parts of the case; and are proved by works admitted as authority by the parties.

That the colony of Louisiana having been previously granted to Crozat, he, in the year 1717, surrendered it to the crown; and that a new grant was, in the same year, made to the West India Company, conceding to them all the lands in allodial tenure; with extensive powers of making establishments of commerce.

That the position of the chief town was designated to be at a place where New Orleans now is, about the year 1720; but that the seat of government was not removed from where it had been first established, until 1724: when a plan was made, of which we have a copy signed by De Panger, who is proved to have been royal engineer, bearing date the 29th of May 1724; and designating by different colours the buildings made before September in the preceding year, and those made since. That altogether some hundreds of houses then appear to have been already built on the streets as delineated on the plan.

That on the 15th of May 1728 another plan was made by Broutin, also a royal engineer, conformable, in the designation of the streets and public plans, to that of De Panger; with the addition of a great number of public and private buildings marked on it, all situated on the streets as designated in both plans.

That in 1744 another plan was engraved and published in Charlevoix's History of Louisiana, conformable in all respects, except in the addition of other improvements, but without any alteration of the streets, wharves and public places, to the plans before men-

tioned. That this work has been admitted as authentic by the parties.

That in all these plans the word *quay* is written opposite to the front row of houses, and on the space between them and the river ; which space constitutes the premises in question.

That on the first and third of these plans the ditch and fortifications inclosing the town plot are delineated ; and that they are carried round three sides ; and terminate at the river on each side, enclosing with the river the premises in question.

Upon these facts and documents, together with the admissions on record that towns in the French colonies were not created by act of incorporation, but by plans made by the royal engineers, and deposited in the bureau of the marine, from whence they have been drawn ; in addition to the corroborating facts of possession, and other circumstances hereafter alluded to ; the appellants rest their claim of title to the premises in question as a part of the town.

The cases of Cincinnati and Pittsburgh contain all the law necessary to be cited in order to establish a title under this evidence ; unless,

1. A body of law should be found to govern this case different from that under which these decisions were given.

2. Some evidence should be found in the case to counteract the force of that relied on by the appellants.

1. The cases are perfectly parallel, except that the fact of destination, which was proved by inference and circumstantial evidence in the one of the cases decided by this court, and by parol testimony in the other, is here shown by written evidence on the face of the plan itself. That here the ditch in the first plan, and afterwards the fortifications, which formed the boundaries of the town, are designated on the plan, showing the premises to be as much an integral part of the town as the streets or squares ; it is therefore not a parcel of land claimed to have been given to the city, but one of the public places of the city itself within its designated boundaries, that is claimed in this suit by the United States as their property, to be disposed of as they may think fit.

In this case, as in those decided by this court, the lands in dispute are such as are absolutely necessary to the wants of a commercial city, more particularly as applicable to those of a great commercial seaport. The cases then only differing in points which make this stronger than those decided, they must be considered as authorities

in point, unless it can be shown that they are not governed by the same law; but this inquiry has already been made in discussing the opinion of the court in the case of De Armas. And I cannot but think that it has been sufficiently shown, that the principles which must govern the cases are essentially the same in both systems of law. I cannot, however, avoid drawing the attention of the court to the very learned and able opinion delivered by the dissenting judge (Martin) on this point. p. 48. He says: " I have looked in vain in the opinion of the court for any reference or allusion to any principle peculiar to the common law of England. It has appeared to me, that the case was determined on the just, broad and general principles of law in the corpus juris civilis: honeste vivere, to act honestly : polliciti servare fidem, when we have made a promise to keep it; and the necessary corollary, turpe est fidem fallere, it is shameful to disappoint expectations we have authorized."

2. If the laws are the same, and there is no difference in the prima facie case we have made, the only circumstance which can prevent a similar decree would be the production of some evidence to counteract that on which we rely. This has been attempted. With what success we shall next inquire.

1. It has been contended, that although this space may have been designated for public use as a quay, yet being given by the king he might resume his grant; that the United States succeeding to his rights may, when they think proper, make the like resumption; and that the king of Spain actually did exercise it, by making grants within the contested limits, with the acquiescence of the city authorities.

The two first points have been already examined; and it has been shown that no such right of resumption did exist, or could exist, either in France or Spain; that in the latter kingdom it was forbidden by positive statute ; and in the former, and indeed every where, by the first principles of justice.

The exercise by the Spanish authority remains to be examined. The plaintiff produced six grants or permissions to build on the space in question. Of these,

The first is that of Magnon, who petitions for a grant of a parcel of land near the levee, for the purpose of pursuing his business as a ship carpenter, which he states to be essential to the service of the king. This petition is referred to the law officer of the crown, (the assessor) who gives it as his opinion, that "although the council of

the city might have some objection on account of the lot being situated within its precincts," yet he advises the grant from the necessity of having a ship yard. But no grant was made, although the opinion was delivered in August 1799, and the transfer of the province did not take place until December 1803.

This fact then corroborates instead of impairing our title. The law officer declares that the city had good objections, that the land lay within the limits; and notwithstanding the alleged necessity no grant was made.

2. The next is a similar application from Chessé, a calker, for permission to build a shed. But this is addressed not to the government but the city authorities, and permission is given to build and hold the shed at their will. Another evidence not of royal but of municipal authority.

3. The third grant is to Bertrand, but it is merely a permission to build a shed, immediately after a distressing conflagration; which was so far from conveying any property, that the petitioner could not repair the shed without asking a new permission.

4. Urtubuise asserts to the commissioners of the United States (as they report), that he had permission to build from the governor, but produces no authority.

Thus far, then, nothing is proved to impair, but something to strengthen, the case of the appellants. Their claim acknowledged by the law officer of the crown in one instance. The actual exercise of dominion over it in another. In the third, nothing but a permission dictated by charity, in a time of great calamity, when strict scrutiny of the powers of different officers would not be made; and in the fourth, nothing but the allegation of a party produced.

The two remaining grants to Mentzinger and Liotaud, are, it must be confessed, acts which directly asserted the right of the king of Spain to dispose of the property in question; but they were the acts of a subordinate officer, and were so far from being acquiesced in by the city, that an appeal and remonstrance were made to the king; on which, according to the usual dilatory proceedings of that monarchy, no decision was made prior to the transfer. This fact is stated in Martin's opinion (p. 47). No other grants however were made; and the attorney-general might have added to these arbitrary acts of disturbance, one of a more striking kind: where a Spanish governor sacrificed four of the principal inhabitants, and placed the tyrant's mark of blood on the very ground now in question. My learned friend's humanity would not permit him to avail himself of

this act of possession, but it is quite as good as another that has been relied on, the parading of the troops on a part of the premises. After this arbitrary sacrifice of the lives of its citizens by the first governor, his successors might reasonably think themselves authorized to use little ceremony in disposing of the property of the city; and if it had been acquiesced in, a better reason might have been alleged than an acknowledgement of the king's title.

The corporation, it is said, have by various acts acknowledged the right of the United States. They have petitioned for, and accepted grants of part of the land; but this was done before they had discovered the evidence of their title. And even if done with a full knowledge of it, could never divest them of the property.

No act of interference with the rights of the city having been found under the French government, one of our strong pieces of testimony has been ingeniously made to supply this deficiency. We produced nineteen ancient grants of lots in the front row of the city, all of which called for the quay as their front boundary; these were produced to corroborate the evidence resulting from the inscription of that word on the plans. Now one of these, instead of using the expression bounded by the quay, says situated on the quay, *sur le quai*: just as we say a farm situated on such a river, a lot in such a street. But to take away all doubt on the subject, we have the lot in question located on the map, with the name inscribed and shown to be one of the front lots bounded by the quay. These are the only evidences of interference by either of the governments: none by France from the laying out of the city in 1720 to the transfer, forty-nine years; and such as have been described, that of Spain, since.

An argument has been used which requires some notice. It is said, that although the inhabitants of the city, individually, might have a right to the use of this ground; yet, the corporate body, now representing them, can have no title; because, during the French and Spanish dominion, there was no corporation. The king, if I understand the argument, had the power of the corporate body, and held the ground for the use of the citizens; that the fee was in him, subject to the servitude, for the benefit of the citizens; that this right was vested in the United States, by the transfer, and that they now held it in the same manner that the king did.

The first objection to this argument, is the radical one, that every community, under the French, as well as the Spanish government, has its officers to represent them; and although, by the statement

of facts, it is considered, that what we call an act of incorporation was not passed, yet all its effects were produced, by the erection of the town. Under both governments, every town had its municipal officers, who took charge of its property and asserted its interests, very frequently, against the encroachments of the king himself; an instance has been already mentioned in the remonstrance of the cabildo, against the governor's grants. Again, if there was no corporate body, nothing to represent the city, but the kingly power; how, and to whom, did the king make the grant of the commons, and the lots fronting the public square, for the propios of the city, as has been proved in this cause. Not to himself, surely. No! he made it to the cabildo, for the use of the city. The ground designated for streets, squares, and quays, by the plan, vested in the municipality of the town, for the common use of the citizens; under the French government, passed to the cabildo, under that of Spain, was exercised by a temporary municipality, appointed by the French prefect, who received the transfer from Spain, in order to deliver it to the United States. They held it until the United States entered into possession, when another provisional municipality was appointed, and remained in office until their powers, by a regular act of incorporation, were vested in the present defendants. By that act, "all the estates, whether real or personal, the rights, dues, debts, claims, or property whatever, which heretofore belonged to the city of New Orleans, or had been held for its use, by the cabildo, under the Spanish government; the municipality, after the transfer, in the year 1803, to France; or the municipality now existing, shall be vested in the mayor, aldermen and inhabitants, to be enjoyed by them and their successors for ever."

This act passed during the first stage of territorial government, when all laws were submitted to congress for their revision. Consequently, they are estopped from saying that they have any interest in property which at any time was held by the municipality or the cabildo; but it has been indisputably shown, that for more than forty-nine years, from the year 1720 to 1769, under the French government, and from that time to the transfer, in 1803, under the Spanish, there has been such possession of the premises. Therefore, if every other title were wanting, this alone would be sufficient to establish our right.

An equally strong objection to this argument, arises from the constitutional power of congress. If the kings of France and Spain

could be trustees for the inhabitants of cities, and exercise either mediately or immediately, all the municipal powers necessary for the protection of such rights, how is congress to interfere? even if the same rights had been transmitted to them by the terms of the treaty.

There is a want of distinction, some confusion of ideas in this branch of the argument. An acknowledged power and duty of sovereignty is confounded with one, with which it is not invested, and which it could not exercise if it were. The sovereign power has no right to exercise the duties which, by its grant, it has devolved upon the authorities of a city or town; it does not hold the property which is dedicated to the public use of the citizens of that town; but it always retains the power of obliging their municipal officers to observe the terms of the grant, to preserve the property for the use for which it was given. Thus, immediately after the transfer of the country to the United States, before the local territorial government had been established; if the municipal officers of New Orleans had attempted to change the streets, to dispose of the public square, or in any other illegal way to injure the rights of the citizens: the United States, as the sovereign of the country, by its proper officers, might have taken cognizance of the case and prevented or redressed the injury. Then, they might have sustained a suit in their name, as the sovereign of the country, for an injunction to prevent an illegal sale of common property; but not even then, one like the present, to recover the possession of it. But after a local government had been established under the territorial grade, with its legislative council, its judicial and executive officers, and all the other attributions of supreme power, restricted only by the powers vested in the general government; when, afterwards, in pursuance of the terms of the treaty, Louisiana was admitted into the union, on equal terms with the other states: in both these cases, that superintendence over the municipality, which bears the attribute of local sovereignty, was transferred to the territorial, first, and afterwards to the state government; and can never be exercised by the United States, unless, indeed, the construction of the constitution should be adopted, which has for the first time, that I am aware of, been contended for in this cause. But even then, if the power given to congress to regulate commerce, should be found to mean the grant of a jurisdiction over wharves and ports, some thing more would be necessary before that power could be exercised; a code of the police of ports, the creation of officers, hitherto unknown to our government, and some

mode of settling the clashing interests of the cities, the states, and the United States, in all the ports of the union. For, I repeat, if the power exists on the wharves of New Orleans, it must exist in those of all the states; for the argument derives it from the constitution, which must operate upon all. That so great an extension of the powers of the general government has never before been thought of, is a strong proof against its adoption; and I quit the argument without any fear that the court, by sanction, will make an inroad on state rights; which the learned counsel for the United States would be the first to deplore.

I may hope from this view that I have shown that the United States can claim no property in the soil.

That they cannot recover in this suit even if they had a title, because they have not shown such a possession as would sustain a suit for a perpetual injunction.

That the decision of the state court forms no authority to guide that of this court.

That the lands in question were dedicated to public use and vested in the city by evidence that cannot be controverted.

And, that the rights of the city, under the French and Spanish government, have been regularly transmitted to the defendants, forming a chain of title that has vested the property in them subject to laws, for the due observance of which they are amenable to the state authorities, not to those of the United States.

But if there should be a failure in any of these points, there is one on which we cannot be mistaken:

The title derived from prescription by a possession of more than a hundred years. Law 1, tit. 7, lib. 5, Recop.; and law 1, tit. 15, lib. 4, Recop. To rebut this, an authority has been introduced from Domat to show that things destined for public use cannot be acquired by prescription; an authority showing clearly that property of that description cannot be acquired by an intruder on the common property of a city, but most clearly not forbidding the acquisition of them by the city under that title; a law made for the protection of public property, not to prevent the application of a law in their favour which comes in aid of lost titles.

Mr Justice M'LEAN delivered the opinion of the Court.

This case is brought before this court by an appeal from the decree of the district court for the eastern district of Louisiana.

[New Orleans v. The United States.]

Under a practice which is peculiar to Louisiana, the attorney of the United States, on their behalf, presented a petition to the court; which represented that the mayor of the city of New Orleans, in pursuance of an ordinance of the city council, had advertised for sale, for a day then past, and was about to advertise anew, for sale, in lots, the vacant land included between Ursuline Levee and Garrison streets, and the public road in the city of New Orleans; and also, the vacant land included between Customhouse Levee and Bienville street, and the public road in the said city.

And the petitioner further stated, that by the treaty of cession of the late province of Louisiana by the French republic to the United States of America, the United States succeeded to all the antecedent rights of France and Spain, as they then were, in and over the said province; the dominion and possession thereof, including all lands which were not private property; and that the dominion and possession of the said vacant lands, ever since the discovery and occupation of the said province by France, remained vested in the sovereign; and had not, at any time prior to the date of said treaty, been granted by the sovereign to the city. And the petitioner prayed for an injunction to restrain the city council from selling the land, or doing any other act which shall invade the rightful dominion of the United States over said land, or their possession of it; and a perpetual injunction was prayed.

To this petition the mayor, aldermen and inhabitants of the city answered, and denied the material facts and allegations in the petition; and they specially denied that the dominion and possession of the land, at the time Louisiana was ceded to the United States, were vested in either the king of Spain or the sovereign of France, either as vacant land or under any other denomination.

And in a supplemental answer the respondents say, that the inhabitants of the city of New Orleans are the true and lawful proprietors of the vacant lots they have been enjoined not to sell.

1. "Because all the space of ground which exists between the front line of the houses of the city and the river Mississippi was left by the king of France, under the name of quays, for the use and benefit of the inhabitants of the city.

2. "Because if since the foundation of the city of New Orleans said space of ground became wider than was necessary for the public use, and the quays of the city, it was in consequence of an increase formed by alluvion, in the greatest part of the front of the

city ; and the works which were necessarily made from time imme-
morial by the inhabitants of the city, or at their expense, to the
levee in front thereof, to advance it nearer to the river than it was
formerly.

3. " Because, by the laws of Spain which were in force at the
time when said alluvions were formed, and said works were made,
alluvions formed by rivers in front of cities belonged to the inhabi-
tants thereof ; who may dispose of the same as they think it con-
venient, on their leaving what is necessary to the public use."

And the respondents say, that the vacant lots are of great value ;
and cannot be disposed of unless they shall be indemnified by the
government, &c.

A general replication was filed by the district attorney in behalf
of the United States.

Statements of facts signed by the parties appear in the record.

If this cause be considered on the broad grou d on which it is
presented by the facts and the arguments of counsel, it is one of
great importance. In one view, the title to property of the value of
several millions of dollars, depends upon its decision ; and in any
aspect in which it may be considered, principles of the civil law, and
the usages and customs of the governments of France and Spain,
and also, it is insisted, important principles of the common law, as
well as the effect of certain acts of our own government, are in-
volved.

In the able arguments which have been heard at the bar, these
topics have been elaborately examined and variously illustrated ; and
it now becomes the duty of the court to pronounce their opinion in
the case. Being constituted the organ of that opinion, the matters in
controversy will be considered under the following arrangement.

1. The rights of the plaintiffs in error, by the principles of the
common law.

2. Their rights under the laws and usages of France and Spain.

3. The interest of the United States in the property claimed by
the city, and their jurisdiction over it.

That property may be dedicated to public use, is a well established
principle of the common law. It is founded in public convenience,
and has been sanctioned by the experience of ages. Indeed, without
such a principle, it would be difficult, if not impracticable, for society
in a state of advanced civilization, to enjoy those advantages which

belong to its condition, and which are essential to its accommodation.

· The importance of this principle may not always be appreciated, but we are in a great degree dependent on it for our highways, the streets of our cities and towns, and the grounds appropriated as places of amusement or of public business, which are found in all our towns, and especially in our populous cities.

It is not essential that this right of use should be vested in a corporate body; it may exist in the public, and have no other limitation than the wants of the community at large.

This court had occasion to consider this doctrine in two important and leading cases, which lately came before them, and which are reported in 6 Peters. The first one was the City of Cincinnati v. The Lessee of White.

In 1789, the original proprietors of Cincinnati designated, on the plan of the town, the land between Front street and the Ohio river, as a common for the use and benefit of the town for ever. A few years afterwards a claim was set up to this common, by a person who had procured a deed from the trustee in whom the fee of the land was vested, and who had entered upon the common, and claimed the right of possession. The proof of dedication being made out to the satisfaction of the court, they sustained the rights claimed by the city. At the time the plan of the city was adopted by the proprietors, and this ground was marked on the plat as a common, they did not in fact possess the equitable title to the space dedicated; but they shortly afterwards purchased the equitable title, and it was held that under the purchase the prior dedication was good.

In their opinion, the court refer to a great number of decisions of this court and others, in this country, and also of the highest courts in England, to sustain the principles upon which the decision was founded. The doctrine is now so well settled, and so generally understood, that it cannot be necessary to cite authorities in support of it.

In the case of Barclay and others v. Howell's Lessee, the same principle was sanctioned, as applicable to facts somewhat variant from those which constituted the Cincinnati case.

In 1784, the representatives of William Penn, in whom the proprietary right of Pennsylvania was vested, by their agent, laid out the town of Pittsburgh. The original plan of the town, the court say, "shows that it was laid out into lots, streets and alleys, from the

junction of the Alleghany and Monongahela rivers, extending up the latter to Grant street. With the exception of Water street, which lies along the bank of the Monongahela, all the streets and alleys of the town were distinctly marked by the surveyor, and their width laid down. Near the junction of the rivers, the space between the southern line of the lots and the Monongahela river is narrow, but it widens as the lots extend up the river.

"From the plan of the town it does not appear that any artificial boundary, as the southern limit of Water street, was laid down. The name of the street is given and its northern boundary, but the space to the south is left open to the river. All the streets leading south terminate at Water street, and no indication is given in the plat, or in any part of the return of the surveyor that it did not extend to the river, as it appears to do by the face of the plat."

And the surveyor being dead, his declarations at the time of making the survey, that Water street should extend to the river, were sanctioned as evidence; and it appearing that the convenience of the town required the extension of this street to the river; and there being no statement or line marked on the plat of the town as opposed to it; and as the public for thirty years or more, in some parts of the town, had thus used the street; and that property had been bought and sold in reference to it, in this form: it was held to be sufficient evidence of its having been dedicated to the public. The street thus extended afforded a large and convenient space for commercial purposes along the shore of the river, beyond what was required for a street.

On the 26th of September 1712, about thirty-eight years after Louisiana had been taken possession of by Lasalle, in the name of the king of France, a charter was granted by the king to Crozat, conferring on him exclusive rights for commercial and other purposes, over a great extent of country, which included the territory that now forms the state of Louisiana.

The absolute property in fee simple was vested in him, of all the lands he should cultivate, with all buildings, &c., he taking from the governor and intendant grants, which were to become void on the land ceasing to be improved.

The laws, edicts and ordinances of the realm, and the custom of Paris, were extended to Louisiana. This charter was afterwards surrendered by Crozat to the king; and a new one was granted on the 6th of September 1717, to a corporation styled the Western Com-

pany.   The land, coasts, harbours and islands in Louisiana, were granted to this company, as they had been to Crozat, "it doing faith and homage to the king and furnishing a crown of gold, of the weight of thirty marks, at each mutation of the sovereignty."

The power is given to this company to grant land allodially. And under its auspices, the ground where the city of New Orleans now stands, was selected as a place for the principal settlement of the province.   A short time afterwards, the foundation of the city was laid, by the construction of a few huts and other improvements. In 1724, and also in 1728, by the facts proved, it seems, maps of the town were made, on which the vacant space, now in controversy, was designated by the name of *quay.*

The Western Company continued to act under its charter until January 1732, when, with the king's leave, the charter was surrendered, and a retrocession was made by the company of the "property, lordships and jurisdiction of Louisiana."

The town of New Orleans was established, and the plan, as designated in the maps referred to, adopted, while the country was under the jurisdiction of the Western Company ; and the dedication to public use, of the vacant space in contest, was made by it, so far as a dedication is shown by the plan and the indorsement of the word *quay* upon it.

In the agreed facts, a quay is admitted to be a vacant space between the first row of buildings and the water's edge, and is used for the reception of goods and merchandize imported or to be exported.   In the Civil Code of Louisiana, a quay is said to be "common property, to the use of which, all the inhabitants of a city, and even strangers are entitled in common, such as the streets and public walks."

The term is well understood in all commercial countries; and whilst there may be some differences of opinion as to its definition, there can be little or none in regard to the popular and commercial signification of it.   It designates a space of ground appropriated to the public use : such use as the convenience of commerce requires.

This entire vacant space has been used for the purposes to which it was appropriated ; with but occasional and slight interruptions, to small portions of it ; from the establishment of the designation of the quay in 1724, until the present time.   The interruptions referred to, were not such as deprived the public of the proper use of the ground. They were generally of a temporary nature, and were permitted,

where private accommodation was in some degree connected with the public convenience.   Temporary shops and baths, which were constructed upon this ground, were of this character.

The public established, at different times and for different purposes, buildings of a more permanent description; but these were rendered necessary for the public service, and they seem not to have encroached, to any injurious extent, on the public use of the quay.

Some of these buildings have long since disappeared, and any of them which may still remain, do not subject the city or the public to any inconvenience.

The city authorities, at an early day, would scarcely be expected to object to the construction of barracks on this space, for the accommodation of the soldiers, which were there stationed for the protection of the city.   And much less would they be expected to object to the use of the common for the occasional performance of military evolutions.

The customhouse and public warehouse, erected on this ground by the Spanish government, have disappeared; and the construction of the present customhouse on the quay, by the federal government, in 1819, cannot be considered as affecting the original dedication.

It may be convenient for the city to have the customhouse situated on this ground, and it does not interrupt the public use.

Two or three grants to small lots of ground within this common, were made under the Spanish authorities; but under the present head of inquiry, it is unnecessary to examine whether these acts were not the exercise of arbitrary power, by the Spanish officers, and being in derogation of vested rights, should not be held as nullities.

If these titles were given in the exercise of a discretion, still they would not go to abrogate a vested right, only to the extent of the titles.   But this question will be more particularly examined hereafter.

Suppose, on the common at Cincinnati, or on the vacant space connected with Water street at Pittsburgh, it had been proved that the state had constructed a customhouse, or temporary barracks, would such acts have been considered as disproving a dedication. Clearly they would not; nor would grants for one or two lots within either space, unadvisedly issued and in derogation of vested rights, have been so considered.

The title to Penn and his heirs was allodial, and we have seen

that the Western Company was authorized to make such titles. Like the heirs of Penn, the Western Company was proprietor of a great extent of territory, and the dedications were made under circumstances somewhat similar; but the proof of dedication of the common or quay at New Orleans, is incomparably stronger than was found in the Pittsburgh case.

It appears that this quay has been greatly enlarged, by the alluvial formations of the Mississippi river; and from this fact an argument is drawn against the right of use in the city, at least to the extent asserted.

The history of the alluvial formations by the action of the waters of this mighty river, is interesting to the public, and still more so to the riparian proprietors.

The question is well settled at common law, that the person whose land is bounded by a stream of water, which changes its course gradually by alluvial formations, shall still hold by the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded, is subject to loss, by the same means which may add to his territory: and as he is without remedy for his loss, in this way, he cannot be held accountable for his gain.

This rule is no less just when applied to public, than to private rights. The case under consideration will illustrate the principle.

If the dedication of this ground to public use be established by the principles of the common law, is it not of the highest importance that the accumulations of the vacant space, by alluvial formations, should partake of the same character and be subject to the same use as the soil to which it becomes united?

If this were not the case, by the continual deposits of the Mississippi, the city of New Orleans would, in the course of a few years, be cut off from the river, and its prosperity impaired. If the city can claim the original dedication to the river, it has all the rights and privileges of a riparian proprietor.

But there is another consideration of great weight on this subject. It appears that the city, from time immemorial, has been compelled to construct at great expense, and keep in repair, levees, which resist the waters of the river and preserve the city from inundation. If it were not for these levees or embankments, it appears from the facts proved, that not only the city of New Orleans, but the country, to a great extent, bordering on the lower Mississippi, would be uninhabit-

able. These works resist the current of the river; eddies are formed, and the deposits rapidly accumulate. In this way has the vacant space been greatly enlarged within twenty or thirty years past.

This enlargement of the quay cannot defeat or impair the rights of the city; and the question only remains to be answered, whether the facts in this case, by the principles of the common law, show a dedication of this vacant space to public use.

No one can doubt, that the answer must be in the affirmative.

The original dedication is proved by the maps in evidence, and by a public use of more than a century. These facts are conclusive. The right of the city is sanctioned by time, and established by uncontroverted facts.

No case of dedication to public use has been investigated by this court, where the right has been so clearly established.

What effect the acts of the federal government, and the acts of the corporation of the city may have upon this right, will be considered in another branch of this case.

As the rights claimed by the city had their origin under the laws of France, and were enjoyed for nearly forty years under the laws of Spain, it becomes necessary to examine those laws, to ascertain the nature and extent of these rights. On this ground the claims of the city have been earnestly and ably, if not confidently resisted, in the argument. The laws of France and of its colonies, it is admitted, prevailed in Louisiana from its first settlement until the 25th November 1769, when they were abrogated by O'Reilly, captain-general under the king of Spain.

On the part of the defendants in error, it is contended, that the corporation of the city has no title whatever to the soil, or to the use of the premises in question: and great reliance is placed on a decision lately made by the supreme court of Louisiana, in the case of C. G. De Armas and M. S. Cucullu v. The Mayor, Aldermen, &c. of the city of New Orleans. Two of the three learned judges who compose that court lay down principles, in their opinions in that case, which are inconsistent with the right asserted by the city in this case: and it is insisted that this decision, which disaffirmed the right set up by the city, is conclusive on this court.

So far as the present controversy may be supposed to arise under the laws of the United States, or the treaty of cession, it is clear that the decision of the Louisiana court cannot be considered as settling the question. In the argument on behalf of the government.

[New Orleans v. The United States.]

the principle is laid down, that by the laws of France, a city or town could not acquire a right or title to the soil of immovables, or to the use of them, without letters patent from the king. And Domat, with other authorities, is referred to, who, in treating of communities, declare, as a primary rule, that they should be established for the public good, and by order or permission of the prince.

By the third section in the statement of facts, it appears that towns in the French colonies, were never incorporated like those of the United States; they are founded in virtue of orders emanating from the government, or from the minister of marine, and transmitted to the governors of the colonies, and their administration was confided to intendants, who had authority to enact the necessary public regulations.

It is insisted that no reasons are assigned why the law of France was not complied with, by issuing a grant, if the dedication of this common was in fact made. That the plan of the town may be presumed to have been made, and the ground in contest designated, as appears on the maps, for other purposes than those supposed by the city authorities. That the maps were for a long time lost sight of, and could not have been considered as evidence to supply the place of a grant: had this been the case, they would have been preserved with care. But the most conclusive argument against this dedication is, it is said, that until the town was incorporated by letters patent, it was incapable of taking by grant. And the decision of the supreme court of Louisiana is referred to as sustaining this doctrine.

Great respect is due to the opinions of the two learned judges who made this decision; and especially on questions arising under the civil law, with the principles of which they must be familiar. Still it would seem that a ready answer may be found to at least some of the objections stated by the counsel. In the first place, the dedication of this common was made by the Western Company, who had power to make grants; and ignorance of their rights, by the inhabitants of the city, or of the necessary evidence to establish them, affords no very satisfactory proof against the existence of those rights. And, if reasons can be assigned, why this ground was designated on the plat as a quay, which show that such indorsement could not have been designed as a substitute for a grant; yet, in the absence of satisfactory reasons, is it not fair to presume in favour of a servitude which has been enjoyed by the city for more than a century?

Whether the retrocession of Louisiana, its jurisdiction, &c., by the Western Company to the king of France, could affect the rights previously granted by it, may be hereafter considered.

It is admitted that the power of the sovereign over the streets of a city, is limited. He cannot alien them, nor deprive the inhabitants of their use, because such use is essential to the enjoyment of urban property. And a distinction is drawn, in this respect, between the streets of a city and other grounds dedicated to public use. The latter, it is contended, is not only under the supervision of the king, as to its use, but he may sell and convey it.

Now, it would seem, in reason, that the principle is the same in both cases. The inhabitants of a town cannot be deprived of their streets, as the streets are essential to the enjoyment of their property. In other words, by closing the streets, the value of the buildings of the town would be greatly reduced, if not entirely destroyed. And if ground dedicated to public use, which adds to the beauty, the health, the convenience and the value of town property, be arbitrarily appropriated by the sovereign to other purposes, is not the value of the property, which has been bought and sold in reference to it, greatly impaired? The value may not be reduced to the same ruinous extent, as it would be to close the streets, but the difference is only in the degree of the injury, and not in the principle involved.

Domat, liv. 1, title 8, sec. 1, art. 1, says, there are two kinds of things destined to the common use of men, and of which every one has the enjoyment. The first are those which are so by nature; as rivers, the sea and its shores. The second, which derive their character from the destination given them by man; such as streets, highways, churches, markethouses, courthouses, and other public places; and it belongs to those in whom the power of making laws and regulations in such matters is vested, to select and mark out the places which are to serve the public for these different purposes."

But, it is said, if the dedication was made by the king, the citizens of New Orleans, or the public, did not acquire a right paramount to his. And that having a right to regulate the use, and the fee never having been conveyed by him to the city, by grant or otherwise, he must of course retain the power of disposing of the property.

The right of the king to this property, is compared to the right of a city, which is vested with the fee and the use; and as in such case the corporation may dispose of the property dedicated with the sanc-

tion of the sovereign power; the sovereign, it is contended, having the right of property and the power to regulate the use, may alien.

And it is said, that this supervision of the use by the king, was a doctrine peculiarly applicable to Louisiana and the city of New Orleans, where the changes are so frequent by the continual formations on the shores of the Mississippi, in addition to increase, of population and business, which often require alterations in the streets and other public places.

Though certain places may be dedicated to public purposes by the supreme power, and may be said to be withdrawn from commerce, still it is insisted where no grant has been made, and private rights have not become vested in the property, it is not withdrawn from the sovereign power.

This argument goes upon the fact, that the title to the quay remained in the king of France, which is a controverted point.

That the king, under the law of nations, was entitled to the right of soil of Louisiana, is not contested. The same rights belonged to the sovereign of France in this respect, as have been accorded to other European sovereigns who made discoveries on this continent; but the conclusion which is drawn from this, that, as no grant was given, the king had a right to alien the ground in contest, the same as any other part of Louisiana, is not admitted.

This argument in behalf of the power of the king of France over the common, is founded upon the supposition, that the cession of the country to the king by the Western Company, destroyed the rights which had become vested under it; and also, that as no grant for the land in contest has been proved, none can be presumed.

The doctrine of presumption is as fully recognised in the civil as it is in the common law. It is a principle which no enlightened tribunal, in the search of truth, and in applying facts to human affairs, can disregard.

The retrocession of Louisiana to France by the Western Company, did not abrogate the rights which had been acquired under it. All the grants to individuals made by the company were respected; and there is no act by the French government, from the foundation of the city to the transfer of the country in 1769 to Spain, which shows that this dedication was not as much respected and sanctioned by the king, as were the grants to private citizens. Does not this long acquiescence of the monarch, and enjoyment of the property by the city, afford some evidence of right? But in addition to this consi-

deration, it appears in evidence, that from the time the plan of the city was adopted until the country was ceded to Spain, numerous transfers of property were made, in which the property is described as being bounded by this quay ; and also, many official transactions of public officers, in which the quay is recognised and referred to. This shows in what light this vacant space was considered by the public, for nearly fifty years after the dedication was made : and it is not probable that this subject could have been wholly overlooked by the king. The plan of the city, containing the designation of this quay, was published by Charlevoix in his Histoire de la Nou-velle France, and perhaps by Voltaire. It is true, that New Orleans contained at this time a very limited population; but it is matter of history, that not many years after the foundation of the city was laid, the most splendid scheme of commercial enterprise, connected with banking operations, was projected in France, in reference to Louisiana. So excited did the public mind become on this subject, and so generally was the public attention directed to it, that there is little probability the dedication of this common could have escaped the notice of the king of France. It was not, probably, deemed too large for the accommodation of a city which was to become the em-porium of a country of such vast resources.

The public use of this common for so great a number of years, and the general recognition of it from the time it was dedicated, in numerous private and official transactions, and the acquiescence of the French king, offered no unsatisfactory evidence of right. If a grant from the king were necessary to confirm the claim of the city, might it not be presumed under such circumstances ?

But suppose the dedication had not been made by the Western Company, and the title were admitted to be in the king, as decided by the supreme court of Louisiana ; is it clear that he had the power to alien the ground at pleasure ?

It cannot be insisted that the dedication of this property to public use, whether the title to the thing dedicated became vested in the city or its use only, could withdraw it from the political jurisdiction of the sovereign power. This would place property of this descrip-tion on a higher and more sacred principle than private property. But in no point of view can this be the case.

That a jurisdiction to a limited extent was exercised by the king of France over the quays of Paris and the public grounds of other cities in the kingdom, such as permitting buildings to be constructed

thereon and regulating the manner and extent of such occupancy, is admitted; but this power seems to have been in the nature of a police regulation, and was so exercised as was not incompatible with the public use of the grounds. This authority, however, does not prove that the fee or the right of use was not in the public, or that the king had power to convey the lands.

Domat says, "rivers, their banks, highways, are public places which are for the use of all, according to the laws of the country. They belong to no individual and are out of commerce; the king only regulates the use of them." And again, in vol. 2, lib. 1, tit. 8, sect. 2, 3 and 16 : "we class public places, as out of commerce; those which are for the use of the inhabitants of a city, or other place, and in which no individual can have any right of property, as the walls, ditches or gates of a city, and public squares."

In Domat, b. 1, tit. 8, sect. 2, art. 19, it is said: "if it should happen that some buildings on a public square should be constructed, they might either be demolished if they should prove any way hurtful or inconvenient, or be suffered to stand upon condition of their paying a rent, or making some other amends to the public, if found to be more advantageous to let them remain, either because they would be an ornament to a market place, or other public place, or because of the rent they would yield, or other advantages that might be made of them.

Judge Martin, who dissented from the opinion of the superior court in the case above cited, says, "of public places, the public may claim the use by exhibiting evidence of a dedication to its profit, by the sovereign or pater familias, without any letters patent, grant or deed."

And "of places which are alleged to be the exclusive property of the town or city, or of which the exclusive right to use is claimed, letters patent, a grant, or deed, must be produced.

The power of appropriating private property to public purposes is an incident of sovereignty. And it may be, that by the exercise of this power, under extraordinary emergencies, property which had been dedicated to public use, but the enjoyment of which was principally limited to a local community, might be taken for higher and national purposes, and disposed of on the same principles which subject private property to be taken.

In a government of limited and specified powers like ours, such a power can be exercised only in the mode provided by law; but in an

arbitrary government, the will of the sovereign supersedes all rule on the subject.

But it must be admitted that while the French laws and usages may show the nature and extent of the right of the public to this common, as it was originated and regulated by them, for nearly half a century; yet it is to the Spanish laws and usages we must chiefly look in determining this head of the controversy.

From the abrogation of the French laws in Louisiana by O'Reilly in 1769, until the country came into the possession of the United States, the laws of Spain acted upon and governed the rights in controversy. The retrocession of the country from Spain to France, and the cession of France to the United States followed so soon afterwards, that these transfers, it is admitted, caused no interruption to the laws of of Spain.

Louisiana was ceded by France to Spain without any abridgement of the vested rights to property enjoyed by private individuals or communities. The rights of the city of New Orleans were in no respect affected by this cession, unless they have been affected by the action of the Spanish laws; and we will now examine this point.

The fundamental laws of the Spanish nation, and which are understood to be alike binding on the king and the people, are found in the Partidas and the Recopilacion.

The 9th law, tit. 20, of Partida 3, contains the following: "the things which belong separately or (severally) to the commons of cities or towns are fountains of water, the places where the fairs or markets are held, or where the city council meet, the alluvions or sand deposits on the banks of rivers, and all the other uncultivated lands immediately contiguous to the said cities, and the race grounds, and the forests and pastures, and all such other places which are established for the common use."

The 23d law, tit. 32, of Partida 3, is as follows: "no one ought to erect a house or other building or works in the squares, nor on the commons, (exidos) nor in the roads which belong to the commons of cities, towns or other places; for as these things are left for the advantage or convenience and the common use of all, no one ought to take possession of them, or do, or erect any works there for his own particular benefit; and if any one contravenes this law, that which he does there must be pulled down and destroyed; and if the corporation of the place where the works are constructed choose to retain them for their own use, and not pull them down, they may

do so; and they make use of the revenue they derive therefrom in the same manner as any other revenues they possess; and we moreover say, that no man who has erected works in any of the abovementioned places can or shall acquire a right thereto by prescription."

In the Recopilacion, law 1, b. 4, tit. 15, is the following: "whereas, in our kingdoms, persons hold and possess some cities, towns, villages, and civil and criminal jurisdiction, without any title from us, or from the kings our predecessors; and it has been doubted whether the same could be acquired against us and our crown by any time: we do ordain and command, that immemorial possession, proved in the manner, and under the conditions required by the law of Toro, which is law the 1st, tit. 7, b. 5, of this Recopilacion, be sufficient to acquire against us and our successors, any cities, towns, villages, use or jurisdiction civil or criminal, and thing or part thereof annexed or belonging thereto. Provided, that the time of said prescription be not interrupted by us, or by our command, naturally or civilly. But the supreme, civil or criminal jurisdiction which kings have, by their sovereignty and kingly power, which consists in exercising and having justice done, when other lords and judges do not; we do ordain, that this cannot be acquired or prescribed by the said time or any other; and likewise what the laws say cannot be acquired by time, must be understood of the imposts and tributes coming to or owing to us."

And again, Recopilacion, law 1, tit. 7, b. 5, is the following law: " we do ordain, that the mayorazgo [mayorat of the French, entail in English] may be proved by the instrument of its institution, together with the written permission of the king who authorised it: provided the said instruments are authenticated; or by witnesses, who testify in the form required by law, to the tenor of the same, and likewise by immemorial custom proved, establishing that the former possessors have held and possessed the property or mayorazgo; that is to say, that the eldest legitimate sons and their descendants used to inherit said property, as such, when the holder thereof left other son or sons, without leaving them any thing equivalent to what those who succeeded to the mayorazgo received; provided the witnesses be of good reputation, and declare that they have seen it thus for forty years, and heard their seniors say that they always saw it, and never heard the contrary said, and that it is a matter of public voice,

notoriety and opinion, amongst the inhabitants or residents of the place."

In the Novissima Recopilacion, b. 7, tit. 16, law 1, is the following: " our pleasure and will is, to preserve their rights, rents and property to our cities, towns and places, and not to make any gift of any thing of them; wherefore we command that the gift or gifts which we may make, or any part of them, to any person whatsoever, are not valid."

A faithful observance of these laws would have preserved the rights of the city, as to the common, free from invasion. No law was cited in the argument which showed the power of the king of Spain to alienate land which had been dedicated to the public use: and it is clear that the exercise of such a power would have violated the public law, which is understood to have limited the exercise of the sovereign power in this respect.

The king of Spain, like the king of France, had the power to give permission to construct buildings on grounds dedicated to public use, without injury to the public rights; but this does not show that either sovereign had the power to alien such lands.

In the 3d Partida, law 3, tit. 32, the sovereign was authorized to grant permission to build on public places. And the comment of Rodriguez, 15 and 16, is, that the building must be so constructed that no one should be injured in his right thereby; because the privileges granted by princes are understood to be granted without prejudice to third persons.

On the 22d February 1770, O'Reilly, governor, &c. of Louisiana, published an ordinance, in conformity to law, "to designate city properties and rents belonging to the city of New Orleans;" and among other regulations, " six dollars were required to be paid by each boat of the tonnage of two hundred tons, &c. for right of anchorage, established and destined to the keeping in repair of the levee or dyke, which does contain the river within its limits, in the whole front of the city, &c." This regulation was to continue during the pleasure of his majesty.

As power was given to the king of Spain, by law, to grant permission to build on public places, it would seem to follow, that such places were not only withdrawn from commerce, but that the king could not alien them. For if he had the power to do this, in as unlimited a manner as over the crown lands, it would include the exercise of every minor authority over them. If he could sell and con-

[New Orleans v. The United States.]

vey the lands dedicated to public use, surely he might, without any authority of law, grant permission to build on such lands.

But, as it appears from the evidence in this case, that permission was not only given to construct buildings on this common, but that a part of it was granted in fee, it is contended that this is evidence of the king's power, not only to regulate the use of this common, but to convey it in fee. And the leading case of Arredondo, 6 Peters 691, is referred to, as sanctioning the principle, that a grant, issued by a Spanish functionary, is not only evidence of title, but also that the officer had the power to issue it.

In that case this court did hold, and the same principle has been sanctioned in numerous cases since, that a grant should be considered as prima facie evidence that it was rightfully issued; but that it might be impeached by any one who set up an adverse claim.

We will examine the grants made, under Spanish authority, to any part of this common, and other acts of jurisdiction over it exercised by the government of Spain, which have been proved by the evidence.

On the 14th of June 1792, Carondelet, governor, intendant, &c., granted to Liotaud, a lot of ground situated within this common; and in the grant he says, "making use of the power which the king has vested in us, we grant in his royal name," &c.

And on the 10th August 1795, another grant was made of a lot in the common to Mentzinger, by the same governor.

In 1793, Arnaud Magnon, a master carpenter, represented, by petition to the governor and intendant-general, that he had built a barge for the public, and as a compensation therefor, he asked eighteen or nineteen feet on one side of his house to enlarge it, the same being very small, and that the same was granted to him, but that he had no instrument of writing as evidence of the same, and which he solicits.

And he also represented to the intendant-general, that his dwelling house having been included in the conflagration of 1788, that governor Miro permitted him to construct a small house near the river, "on the inner side of its dyke," and in consequence of this misfortune, and his having built a barge, &c. a small portion of land of eighteen to nineteen feet adjoining his house, had been granted to him. That he was afterwards allowed to build a shed for the convenience of ship buildings, &c., and he prays that a title may be granted to him for the lot.

This petition was submitted to the attorney-general, who reported that it appeared to him, "it would be an act of injustice to refuse the petitioner the corresponding titles of property that he solicits;" for, "although the council of this city might have some objection, on account of the said lot being situated within its precincts, this opposition may be easily overcome, by the certainty that if Magnon did not occupy the said lot, it would be necessary that another should occupy it, owing to the necessity and usefulness of said ship yard to the public."

It does not appear that this claim was ever carried into grant, by the Spanish authorities.

In 1783, on the petition of Etienne Planche, who represented himself to be a carpenter and calker, and having much work which he could not do in his yard, &c., he asked permission to build a shed in front of his house, which was not to be closed, &c. This leave was given, and he, and those claiming under him, occupied the ground for many years, but no grant was ever obtained from the Spanish governor for the lot.

Catharine Gonzales, widow of Bertrand, set up a claim; and it appears that on the petition of her former husband he was permitted to rebuild his house on the common, which had fallen into decay, which was allowed by the governor, &c. But no grant was ever issued by the Spanish authority for this lot.

These permissions to build were given by the governor and intendant, under the law, which has been cited, that authorized the sovereign to grant permission to construct buildings on the public grounds.

This was not considered inconsistent with the public use, as the power was not to be exercised to the prejudice of third parties.

The three lots for which grants were issued, it must be admitted, under the circumstances, is such a final disposition of the property as is wholly incompatible with the public right. For the fee of these lots was not only granted, but also the use.

This transfer of the fee, it is contended, affords conclusive evidence that the title to the common remained in the king, and having, in addition to this, the power to regulate its use, he could alien it at pleasure.

If this power was possessed by the king, why was the authority given, in the law which has been stated, to grant permission to construct buildings on public grounds? This power, as appears from

[New Orleans v. The United States.]

the record, was exercised over the common in controversy, and only in three instances were lots granted absolutely. In the case of the Mayor, &c., of New Orleans v. Bermudez, decided by the supreme court of Louisiana, 3 Martin 309, the court say, "however contradictory these expressions may appear to be, the worst conclusion which can be drawn therefrom against the city of New Orleans is, that they had not that kind of possession which is the consequence of an absolute right of ownership. Yet the sovereign having never thought fit to exercise any further right over these commons, and the claim of the city to them having been recognized and confirmed by the successor of that sovereign, the inhabitants of New Orleans must be considered as having never ceased to be the rightful possessors of that land," &c.

And in the same book, 303, the court say, "in the year 1795, the baron Carondelet, then governor of Louisiana for the king of Spain, granted to Henry Mentzinger, the appellee, a lot of ground, situated in the city of New Orleans, close to the Levee, &c.

"But the appellants contend, that the spot on which it is located is part of the public highway, and, therefore, could not have been lawfully granted for private use, even by the king himself.

"That public places, such as roads and streets, cannot be appropropriated to private uses, is one of those principles of public law, which required not the support of much argument. Nor is there any doubt, that if, by a stretch of arbitrary power, the preceding government had given away such places to individuals, such grants might be declared void.

"But is this grant located in a street, or on the public road? On this important question of fact, the evidence, produced by the appellant is, 'by no means satisfactory.' They show, that according to general usage in this country, the public road in front of the river is close to the Levee. But could there be no derogation from that usage? Was that usage observed within the city of New Orleans? Does not the convenience of placing markets and other public places as near the water as possible, as it is recommended by the law of the Indies, make it necessary to deviate from such usages in cities?

"General usage, however, is the only ground on which the appellants rest their pretensions. No plan of the city has been exhibited, to show that the lot of the appellee is located upon a place which had been reserved for public use; no testimony has been adduced to prove, that this spot is part of the ground laid out for the

public road. We are called upon to declare this grant void, merely because the general usage of the country is to place the road next the Levee."

From this opinion it would seem, that if there had been satisfactory proof before the court, that the ground in controversy had been appropriated to public use, the decision, instead of being favourable to the grantee, would have been against him.

There can be no difference in principle, between ground dedicated as a quay to public use, and the streets and alleys of a town: and as to the streets, it may be asked, whether the king could rightfully have granted them. This will not be pretended by any one. And it is believed, that the public right to a common, is equally beyond the power of the sovereign to grant : unless he dispose of it under the power to appropriate property to the national use; and then compensation must be paid.

The grant to Liotaud was also contested by the city authorities; but it was decided against them on a ground which did not embrace the merits of the claim, on the part of the city, as now presented.

In speaking of this case, Mr Justice Martin, in his able and learned opinion in the case of De Armas and Cucullu v. The Mayor of New Orleans, &c., says : " in Liotaud's case, the then plaintiffs laboured under the inability to establish the appropriation to the public use, by the founder of the city of New Orleans, of the space which separates the first row of houses from the Mississippi.

" The appellants stated their ability to establish that, immediately after the grant; murmurs had been excited; and the inalienability of any part of the space having been tenaciously insisted on, the governor had revoked his grant, and indemnified the grantee, by the concession of the lot on one of the streets: but the court decided the testimony was inadmissible, and the witnesses were not heard."

" Magnon," the same judge remarks, " was a ship builder, and the ship yard was between the Levee and the water. The governor, deeming the builder's residence near it necessary to the public service, allotted him a space of ground to live on near the yard, but on the opposite side of the levee. The question arising out of this grant was not litigated ; the city agreeing to compensate Magnon for the relinquishment of his claim." This lot, however, though a part of the ground alleged to have been dedicated to public use, is not within the common or quay contested in this case.

And it appears from the above opinion, that to prevent any other titles being made for any part of the common, certain proceedings

were instituted by the attorney-general, at the instance of the city authorities, which prevented the emanation of any other grants for any part of the quay, until the country was ceded to the United States.

. From a careful examination of the jurisdiction exercised over this common by the governments of France and Spain, and the laws which regulated this description of property in both countries, the conclusion seems not to be authorised, that it was considered as a part of the public domain or crown lands, which the king could sell and convey.    This power was not exercised by the king of France, and the exercise of the power by the Spanish governor in the instances stated, was in violation of the laws of Spain, and equally against its usages.

The land, having been dedicated to public use, was withdrawn from commerce; and so long as it continued to be thus used, could not become the property of any individual.    So careful was the king of Spain to guard against the alienation of property which had been dedicated to public use, that in a law cited, all such conveyances are declared to be void.

. It would be a dangerous doctrine to consider the issuing of a grant as conclusive evidence of right in the power which issued it.    On its face it is conclusive, and cannot be controverted; but if the thing granted was not in the grantor, no right passes to the grantee.    A grant has been frequently issued by the United States for land which had been previously granted; and the second grant has been held to be inoperative.    And in a case recently decided by this court, where the government had granted land in the state of Ohio, as land belonging to the United States, which was found to be within the Virginia reservation in that state, to satisfy certain military claims, it was held, that the title did not pass under the grant.    If, then, the common in question had been dedicated to public use so as to withdraw it from commerce, and so vest the title in the public as to preserve it from alienation by the king, the grants issued for the lots stated, cannot affect the right of the public, at least beyond the limits of those grants.

. That both the kings of France and Spain could exercise a certain jurisdiction over this common, and other places similarly situated, has been stated; but this was a police regulation, and was rightfully exercised in such a manner as not to encroach upon the public use. This seems to be the result to which a careful examination of the laws and usages of both countries must lead us.

[New Orleans v. The United States.]

We come now to examine, under the third head, the interest of the United States in the property claimed by the city, and their jurisdiction over it.

The first article of the treaty of cession is as follows: "whereas, by the article the third of the treaty, concluded at St Ildefonso the 1st October 1800, between the first consul of the French republic and his catholic majesty, it was agreed as follows: his catholic majesty promises and engages, on his part, to retrocede to the French republic, six months after the full and entire execution of the conditions and stipulations herein relative to his royal highness the duke of Parma, the colony or province of Louisiana, with the same extent that it now has in the hands of Spain, and that it had when France possessed it, and such as it should be after the treaties subsequently entered into between Spain and other states." And in behalf of the French republic, the first consul ceded, "for ever and in full sovereignty, the said territory, with all its rights and appurtenances, as fully and in the same manner as they have been acquired by the French republic," &c.

And in the second article it is declared, that in the cession "are included the adjacent islands belonging to Louisiana, all public lots and squares, vacant lands, and all public buildings," &c.

Under this treaty Louisiana was ceded to the United States in full sovereignty, and in every respect, with all its rights and appurtenances, as it was held by the republic of France, and as it was received by that republic from Spain. And it is insisted, that the same rights of jurisdiction and property which appertained to the sovereign of Spain, under its laws and regulations, were, by the treaty, transferred to the United States: and that whether this right extends to the fee of the property in contest, or the regulation of its use, it is contended that this court must take jurisdiction of the case, and restrain the city authorities from selling any part of it.

To show that the federal government has considered this common as a part of the public domain, under the treaty, various laws of congress have been referred to, and official proceedings by the agents of the government, in reference to it; and also it is shown, that the action of the government has been solicited by the city authorities, who, by these acts, it is insisted, have acknowledged the right of property to be in the United States, as asserted in their behalf by the district attorney of Louisiana. We will refer more particularly to those acts.

On the 26th March 1804, congress passed an act, "erecting Louisiana into two territories, and providing for the government thereof;" in the fourteenth section of which it was provided, that all grants for land within the territories ceded by France, the title of which was, at the date of the treaty of St Ildefonso, in the crown, &c. of Spain, were declared to be null and void." Provided, nothing in the section was to make void any bona fide grant, agreeably to the laws, usages, &c. of the Spanish government. An act entitled "an act for ascertaining and adjusting the titles and claims to land, within the territory of Orleans, and the district of Louisiana," was passed on the 2d March 1805. This act, after specifying what titles under the Spanish government should be held valid, and requiring the evidences of title to be exhibited, &c., authorized the appointment of a register, who, with two commissioners to be appointed, were to constitute a board for the decision of land claims in the territory, &c.; and their report was required to be laid before congress, &c. And by an act of the 3d March 1807, it was provided, "that the claim of the city of New Orleans to the commons adjacent to said city, and within six hundred yards of the fortifications of the same, be, and the same is hereby recognised and confirmed : provided, that the corporation shall, within six months after passing this act, relinquish and release any claim they may have to such commons beyond the distance of six hundred yards aforesaid," &c.

Other acts were passed in relation to land claims in the district, which it cannot be necessary to notice.

Arnaud Magnon, whose claim has been before referred to, applied to the commissioners under the above act to report on land titles, &c., who reported : " we know of no law or usage of the Spanish government respecting claims similarly situated : but think it highly probable, that had the claimant applied he would have obtained a grant for it, as a grant was made to a lot of ground adjoining him under no higher pretensions. Nor does this appear to come within any of the provisions of the laws of the United States, although there have been ten consecutive years' possession ; the land has not been inhabited or cultivated. This part of the claim we do not feel ourselves authorized to decide on ; but are of opinion, that, in justice, the claim ought to be confirmed."

And, on the claim of John J. Chessé, the commissioners report, that "they did not feel authorized to make any decision on the claim;

but they thought it would be more an act of justice than generosity if the government should confirm it."

A similar report was made on the claim of Catherine Gonzales and Peter Urtubuise. Their claims were for lots of ground within the common : and they have been confirmed by acts of congress; and patents have been issued to the claimants.

The claim of the city to the commons was presented by P. Derbigny and L. S. Kerr; who were duly authorized to present it in behalf of the city. And the commissioners reported : " that the claim was in part settled by the acts of congress of 1807 and 1811 ; which confirm to the corporation six hundred yards from the fortifications of the city ; but which are, nevertheless, embraced by the claim aforesaid. That they had in vain searched in the documents to which they were referred for proof of even a shadow of title to this land. That there was no evidence of it ever having been granted or considered as belonging to the city, either by the French or Spanish government. The board, therefore, rejected the claim."

On the 3d of April 1812, congress " passed an act granting to the corporation of the city of New Orleans the use and possession of a lot in the said city."

By this act the city " was authorised to use, possess and occupy the same, for the purpose of erecting, or causing to be erected and kept in operation a steam engine or engines for conveying water into the said city ; and all buildings necessary to the said purpose : provided, that if the space of ground shall not be occupied for the said purpose within the term of three years from and after the passing of this act, or shall, at any time thereafter, cease to be so occupied for the term of three years, the right and claim of the United States thereto shall remain unimpaired."

And by an act of the 30th of March 1822, " the corporation of the city of New Orleans was authorized to appropriate so much of the lot of ground on which fort St Charles formerly stood as may be necessary for continuing Esplanade street to the Mississippi river ; and, also, to sell and convey that portion of the said ground which lies below said street," &c.

By the act of the 20th of April 1818, congress authorized the president to abandon the use of the navy arsenal, military hospital and barracks in the city of New Orleans; and, after laying off the ground into lots, to sell them at public sale, &c. And he was authorized to cause the fort St Charles to be demolished, and the navy yard in the

city to be discontinued; and the lot of ground on which the fort stood was appropriated to the use of a public square, to be improved as the corporation of the city should think proper. These acts related to lots within the common of the city; though but few of them are included in that part of the ground respecting which this suit was commenced.

These official acts of the federal government, by legislation and otherwise, respecting the common claimed by the city, and some of which were induced by the special application of the corporation, afford strong evidence, it is contended, not only of the right of the United States to the property in question, but that such right was fully recognized by the corporation.

It must be admitted, that several of these acts are unequivocal in their character, and do show, as contended by the attorney-general, an admission, on the part of the city, not only that congress had a right to legislate on this subject, but also to dispose of certain parts of the common in fee. And these acts, if unexplained, do strengthen the argument against the claim set up by the city.

It is a principle sanctioned as well by law as by the immutable principles of justice, that where an individual acts in ignorance of his rights, he shall not be prejudiced by such acts. And this rule applies at least with as much force to the acts of corporate bodies, as to those of individuals. We will, therefore, inquire, as we are bound to do, whether, under the circumstances of this case, the acts of the city can, justly, be considered as prejudicing the claim which they assert.

In the first place, the fact that when we obtained possession of Louisiana, the city of New Orleans was composed of citizens who, in their language, habits of thinking and acting, were almost as dissimilar from other parts of the United States, as if they had inhabited a different continent, is of great importance; and, above all, they were unacquainted with the nature of our government, in a great degree, and the principles of our jurisprudence.

They may be supposed to have been acquainted with the civil law, and to some extent, at least, with their rights as recognized and sanctioned by the laws and usages of Spain.

It is well known that the policy of Spain in regard to a disposition of her public domain, is entirely different to that which has been adopted by the United States. We dispose of our public lands by sale; but Spain has uniformly bestowed her domain in reward for

meritorious services, or to encourage some enterprise deemed of public utility.

That a community, composed, as were the citizens of New Orleans, almost entirely of foreigners, and under the circumstances which existed, should have mistaken their rights, is not extraordinary. Indeed, it would have been a matter of surprise if they had, under the new system, understood the extent of their claim. They did exhibit their claim to the commissioners, who rejected it. And this, no doubt, induced the corporation to make the applications to congress which have been noticed.

But in addition to the consideration that the city authorities, probably, acted in ignorance of their rights, it may be safely assumed, that they had not the power, by the acts referred to, to divest the city of a vested interest in this common.

We come now to inquire whether any interest in the vacant space in contest, passed to the United States under the treaty of cession. In the second article of the treaty, "all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices, which are not private property," were ceded. And it is contended: as the language of this article clearly includes the ground in controversy; whether it be considered a public square or vacant land; the entire right of the sovereign of Spain passed to the United States.

The government of the United States, as was well observed in the argument, is one of limited powers. It can exercise authority over no subjects, except those which have been delegated to it. Congress cannot, by legislation, enlarge the federal jurisdiction, nor can it be enlarged under the treaty-making power.

If the common in contest, under the Spanish crown, formed a part of the public domain or the crown lands, and the king had power to alien it, as other lands, there can be no doubt that it passed under the treaty to the United States, and they have a right to dispose of it, the same as other public lands. But if the king of Spain held the land in trust, for the use of the city, or only possessed a limited jurisdiction over it, principally, if not exclusively, for police purposes, was this right passed to the United States under the treaty?

That this common, having been dedicated to public use, was withdrawn from commerce, and from the power of the king rightfully to alien it, has already been shown; and also, that he had a limited power over it, for certain purposes. Can the federal govern-

ment exercise this power? If it can, this court has the power to interpose an injunction or interdict to the sale of any part of the common by the city, if they shall think that the facts authorize such an interposition.

It is insisted that the federal government may exercise this authority, under the power to regulate commerce.

It is very clear, that as the treaty cannot give this power to the federal government, we must look for it in the constitution; and that the same power must authorize a similar exercise of jurisdiction over every other quay in the United States. A statement of the case is a sufficient refutation of the argument.

Special provision is made in the constitution, for the cession of jurisdiction from the states over places where the federal government shall establish forts, or other military works. And it is only in these places, or in the territories of the United States, where it can exercise a general jurisdiction.

The state of Louisiana was admitted into the union, on the same footing as the original states. Her rights of sovereignty are the same, and by consequence no jurisdiction of the federal government, either for purposes of police or otherwise, can be exercised over this public ground, which is not common to the United States. It belongs to the local authority to enforce the trust, and prevent what they shall deem a violation of it by the city authorities.

All powers which properly appertain to sovereignty, which have not been delegated to the federal government, belong to the states and the people.

It is enough for this court, in deciding the matter before them, to say, that in their opinion, neither the fee of the land in controversy, nor the right to regulate the use, is vested in the federal government; and, consequently, that the decree of the district court must be reversed, and the cause remanded with directions to dismiss the bill.

As it is not necessary, we do not decide on the right of the corporation to sell any part of the common, or to appropriate it in any other manner than as originally designated.

This cause came on to be heard on the transcript of the record from the district court of the United States for the eastern district of Louisiana, and was argued by counsel; on consideration whereof, it is

ordered, adjudged and decreed by this court, that the decree of the said district court in this cause be, and the same is hereby reversed and annulled. And this court, proceeding to render such decree as the said district court ought to have rendered in the premises, doth order, adjudge and decree that the bill of the complainant in this cause be, and the same is hereby remanded to the said district court of the United States for the eastern district of Louisiana, with directions to the said district court to carry this decree into effect.